UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANNETTE M. DOW AND
WILLIAM G. SCHISLER, SR.,

                                    Plaintiffs,

                                                              6:16-CV-00514
v.                                                            (DNH/TWD)

M & T BANK, BAYVIEW LOAN SERVICING, LLC,
AND EMERY LAW,
                                    Defendants.
_____

APPEARANCES:

ANNETTE M. DOW
WILLIAM G. SCHISLER, SR.
Plaintiffs *pro se*
1010 Green Street
Utica, New York 13502


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


## ORDER and REPORT-RECOMMENDATION

        The Clerk has sent to the Court for review the complaint brought by *pro se* Plaintiffs

Annette M. Dow and William G. Schisler, Sr., against Defendants M & T Bank, Bayview Loan

Servicing, LLC, and Emery Law.  (Dkt. No. 1.)  Also before the Court is Plaintiffs' joint

application for leave to proceed *in forma pauperis* ("IFP application").  (Dkt. No. 3.)  For the

reasons that follow, the Court grants Plaintiffs' IFP application (Dkt. No. 3) solely for purposes

of initial review and recommends dismissing the complaint (Dkt. No. 1) in its entirety with leave

to amend.

## I.      IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).  After reviewing Plaintiffs' IFP application, the Court finds that Plaintiffs meet this standard.  Therefore, the Court grants Plaintiffs' IFP application solely for the purpose of this initial review.  (Dkt. No. 3.)

## II.     LEGAL STANDARDS FOR INITIAL REVIEW

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a person proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

### III.    PLAINTIFFS' COMPLAINT

Plaintiffs commenced this action, utilizing a form civil rights complaint, against Defendants M & T Bank, Bayview Loan Servicing, LLC, and Emery Law.  (Dkt. No. 1.) Generally, Plaintiffs complain about the continued "flip-flopping of the mortgage payment company" from Bayview Loan Servicing, LLC, to M & T Bank.  *Id*. at ¶ 4.  Plaintiffs further allege that despite writing numerous "hardship letters," Defendants continued to raise Plaintiffs' mortgage payment for their property located at 105 Fourth Street, Rome, New York (the "property").  *Id*.  Plaintiffs state that up until June 3, 2014, their mortgage payment for the property was $700.00, which was paid monthly.  *Id*.

However, because "someone" at M & T Bank accepted Plaintiffs' money without recording the payment, Plaintiffs stopped making their mortgage payment for the property.  *Id*. According to Plaintiffs, they did not receive "any notices" from M & T Bank while they waited for Defendants to "straighten" the matter out on "their side."  *Id*.  Thereafter, Plaintiffs became aware the M & T Bank was selling the property for $80,000.[1]  *Id*.  Plaintiffs further allege that the property has "mold damage" due to the "Rome codes and Rome Water Department."  *Id*. Finally, Plaintiffs claim that "they cannot sell out house as it is totally mold damage!"  *Id*.

Based on these events, Plaintiffs allege:  (1) "void of agreement undue care for hanicap [sic] disabled hearing impaired people[;]" (2) "breach of contract[;]" and (3) "failure to properly notify in due time of lapse in payment."  *Id*. at ¶ 5.  As relief, Plaintiffs seek $30.5 million in

---

[1]  Plaintiffs attach to their complaint a Notice of Sale, Supreme Court County of Oneida, *M & T Bank v. Dow*, Index Number 1300699-14, which provides that on May 6, 2016, "[p]ursuant to a judgment of foreclosure and sale granted on or about April 1, 2015, . . . the undersigned Referee will sell at public auction . . . [the] [p]remises known as 105 Fourth Street, Rome, New York, 13440."  (Dkt. No. 2-4).

damages for pain, suffering, emotional distress, and "undue stress to a handicap autistic child and cancer patient." *Id.* at ¶ 6.

## IV.    ANALYSIS

### A.    Jurisdiction

"It is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). Federal jurisdiction exists only when a "federal question" is presented (28 U.S.C. § 1331), or where there is "diversity of citizenship" and the amount in controversy exceeds $75,000 (28 U.S.C. § 1332). *See Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 136 (2d Cir. 2002); *Townsend v. L.T. Auto Transport, Inc.*, No. 1:13-CV-1601 (MAD/CFH), 2014 WL 1572801, at *3 (N.D.N.Y. Apr. 18, 2014).[2]

A district court must be assured of its subject matter jurisdiction over matters pending before it at all times. *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009). The party asserting federal jurisdiction also has the burden of showing that a case falls within a district court's jurisdiction. *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006) ("It is well-settled that the party asserting federal jurisdiction bears the burden of establishing jurisdiction."). To this end, a complaint must contain "a short plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1).

Subject matter jurisdiction can never be waived or forfeited. *United States v. Cotton*, 535 U.S. 625, 630 (2002). Federal courts are mandated to *sua sponte* examine their own jurisdiction at every stage of the litigation. *ACCD Global Agric., Inc. v. Perry*, No. 12 Civ. 6286 (KBF), 2013 WL 840706, at *1 (S.D.N.Y. Mar. 1, 2013) (quoting *Dumann Realty, LLC v. Faust*, No. 09

---

[2] The Court will provide Plaintiffs with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curiam).

Civ. 7651 (JPO), 2013 WL 30672, at *1 (S.D.N.Y. Jan. 3, 2013) (citing *Gonzalez v. Thaler*, -- U.S. --, 132 S.Ct. 641, 648 (2012))).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

###     1.     Federal Question Jurisdiction

Federal question jurisdiction exists where the "complaint established either that federal law creates the cause of action or that plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 25 (2d Cir. 2000) (internal quotation marks omitted).  "A cause of action arises under federal law only when the plaintiff's 'well-pleaded complaint' raises an issue of federal law."  *New York v. Shinnecock Indian Nation*, 686 F.3d 133 (2d Cir. 2012) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987)).  Here, Plaintiffs have utilized a form civil rights complaint pursuant to 42 U.S.C. § 1983.  (Dkt. No. 1.)

####     a.     Section 1983

To state a claim under § 1983, the plaintiff must allege both that the defendants have violated plaintiff's rights under either the Constitution or laws of the United States and that the defendants acted "under color of state law."  *Rae v. City of Suffolk*, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010); 42 U.S.C. § 1983.  Section 1983 "'is not itself a source of substantive rights[,] . . . but merely provides 'a method for vindicating federal rights elsewhere conferred[.]'"  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

It is well settled that "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation and internal quotation marks omitted).  A

plaintiff must therefore allege facts showing that a defendant was either a state actor or a private party acting under color of state law. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002). A person acts under color of state law when he or she acts in his or her official capacity "clothed with the authority of state law," or acts under "pretense" of law by purporting to act with official power. *Pleasure Island, Inc. v. City of New York*, No. 12 Civ. 4699(ILG)(SMG), 2013 WL 2311837, at *5-6 (E.D.N.Y. May 24, 2013) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). A private party may act under color of state law if he or she engages in conduct that constitutes willful participation in joint activity with the state. *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam). The nexus to the state must be so close as to be fairly treated as that of the state itself. *Tancredi v. Metro Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (citations omitted).

In this case, Plaintiff is suing M & T Bank (a mortgage company), Bayview Loan Servicing, LLC, (a loan company), and Emery Law, (modification lawyers), none of which act under color of state law. Moreover, Plaintiffs have failed to allege a violation of their rights under the Constitution or laws of the United States. Therefore, Plaintiff has failed to state a claim under § 1983.

b.    American with Disabilities Act ("ADA")

The ADA provides protection against discrimination based upon disability. 42 U.S.C. § 12101 *et seq*. Although Plaintiffs' complaint does not specifically reference the ADA, Plaintiffs allege as their first cause of action: "void of agreement undue care for hanicap [sic] disabled hearing impaired people!" (Dkt. No. 1. at ¶ 5.) Thus, the Court will consider whether Plaintiffs have stated a claim under the ADA.

Plaintiffs have not stated a claim under Title I of the ADA, 42 U.S.C. § 12112(a), which provides protection from discriminatory adverse employment actions to persons with physical or mental impairments who are qualified to perform the essential functions of their positions with or without reasonable accommodations. *See Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) ("Title I of the ADA expressly deals with th[e] subject of employment discrimination . . . .") (citation and internal quotation marks omitted). Since Plaintiffs' claim has nothing to do with employment, there is no reason for further analysis of Title I of the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."[3] 42 U.S.C. § 12132. In order to state a claim under Title II of the ADA, a plaintiff must allege that "(1) he or she is a qualified individual with a disability; (2) . . . defendants are subject to the ADA; and (3) that plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants by reason of plaintiff's disabilities." *Shomo v. City of New York*, 579 F.3d 176, 185 (2d Cir. 2009) (citation and internal punctuation omitted).

Even if Plaintiffs are qualified individuals with a disability (*see* 42 U.S.C. § 12131(2)), Defendants are private individuals, not public entities offering services, programs, or activities in which Plaintiffs were not allowed to participate because of their disabilities. *See* 42 U.S.C. §

---

[3] "Services, programs, or activities," not explicitly defined in the ADA have been construed by the Second Circuit as "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context . . . ." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2d Cir. 1997), *superseded on other grounds*, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).

12131(1) (defining "public entity" as "any State or local government [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ."). Therefore, Plaintiffs have failed to state a claim under Title II of the ADA.

Title III of the ADA applies to public accommodations and provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any public place by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). "Places of public accommodation," are defined in 42 U.S.C. § 12181(7) as facilities owned by private entities affecting commerce, which are considered public accommodations for the purposes of the ADA, including:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor; (B) a restaurant, bar, or other establishment serving food or drink; (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment; (D) an auditorium, convention center, lecture hall, or other place of public gathering; (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment; (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment; (G) a terminal, depot, or other station used for specified public transportation; (H) a museum, library, gallery, or other place of public display or collection; (I) a park, zoo, amusement park, or other place of recreation; (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education; (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

To state a claim under Title III of the ADA, a plaintiff must allege that he or she is disabled as defined by the ADA and that the defendant owns or operates a public accommodation and has discriminated against him or her within the meaning of the ADA. *See Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 368 (2d Cir. 2008). Here, the only property at issue in this case is Plaintiffs' residence. (Dkt. No. 1.) Thus, there is no public accommodation, as defined in the ADA, involved in this case. Therefore, Plaintiffs have failed to state a claim under Title III of the ADA.

Plaintiffs have not alleged, and the Court has not been able to determine, any other basis for federal question jurisdiction. Accordingly, this Court does not have federal question jurisdiction under 28 U.S.C. § 1331.

## 2. Diversity Jurisdiction

District courts have original jurisdiction "of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs," and is between "citizens of different States." 28 U.S.C. § 1332(a)-(1). Thus, in order to bring an action based upon diversity of citizenship, all adverse parties must be completely diverse in their citizenship. *Ensign Yachts, Inc. v. Arrigoni*, No. 3:09-CV-209 (VLB), 2010 WL 918107, at *7 (D. Conn. Mar. 11, 2010) (citing *Herrick Co., Inc. v. SCS Comm., Inc.*, 251 F.3d 315, 322 (2d Cir. 2001)). "Diversity is not complete if any plaintiff is a citizen of the same state as any defendant." *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir. 2005); *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373-74 (1978) ("[D]iversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff.") (emphasis in original).

Here, Plaintiffs may be attempting to assert diversity jurisdiction. (Dkt. No. 1.) Plaintiffs have alleged that they reside in Utica, New York, and that Defendant M &T Bank is located in Dallas, Texas, Defendant Bayview Loan Servicing, LLC, is located in Dallas, Texas, and Defendant Emery Law is located in Myrtle Beach, South Carolina. (Dkt. No. 1. at ¶¶ 2-3.[4]) Moreover, Plaintiffs seek $30.5 million for their "pain, suffering, emotional distress, [and] undue stress to a handicap autistic child and cancer patient." *Id*. at ¶ 6.

However, courts "have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore, they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Perry*, 2013 WL 840706, at *1 (citation and internal quotation marks omitted). "This means investigating all aspects of diversity requirements—not only whether all plaintiffs are completely diverse from all defendants, but also whether the amount in controversy reaches the statutory level." *Id*.

The Court takes judicial notice that M & T Bank is a New York business corporation with its principal offices located in Buffalo, New York. (Dkt. No. 1 at ¶ 3[5].) Here, because Plaintiffs and M & T Bank are both citizens of New York State, there is not complete diversity of citizenship. *See Manufacturers and Traders Trust Co. v. HSBC Bank USA, N.A.*, 564 F. Supp. 2d 261 (S.D.N.Y. 2008) ("[D]iversity is lacking where any party to the action is a citizen of the same state as an opposing party.") (citation omitted). Moreover, although Plaintiffs request

---

[4]  Individuals are citizens of the place they are domiciled, or where they are physically located with intent to stay. *See Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*, 224 F.3d 139, 141(2d Cir. 2000) ("[E]stablishing one's domicile in a state generally requires both physical presence there and intent to stay.").

[5] *See* NYS Department of State, Division of Corporations, *available at* https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_nameid=333350&p_corpid=284484&p_entity_name=M%26T%20Bank&p_name_type=A&p_search_type=BEGINS&p_srch_results_page=0 (last visited May 24, 2016).

$30.5 million in compensation for their pain and suffering, Plaintiffs have not included a specific monetary claim for the actual damages alleged to have been caused by Defendants in either the body of the complaint or prayer for relief. *Id*. at ¶ 6. Nor have Plaintiffs alleged facts showing a reasonable probability that their claim against Defendants is in excess of $75,000. Accordingly, this Court does not have diversity jurisdiction. 28 U.S.C. § 1332(a).

Based upon the foregoing, the Court recommends that Plaintiffs' complaint (Dkt. No. 1) be dismissed for lack of subject matter jurisdiction and failure to state a claim.

### 3. State Law Claims

Plaintiffs' complaint, liberally construed, alleges state law claims for breach of contract against Defendants M &T Bank and Bayview Loan Servicing, LLC. (Dkt. No. 1.[6]) A federal court may, in its discretion, exercise supplemental jurisdiction over a state law claim, but only to the extent it is accompanied by a claim over which the court has original jurisdiction. *See* 28 U.S.C. § 1367 ("[E]xcept [in limited circumstances], in any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related[.]").

The Court finds based upon the allegations in the complaint that there is no federal question or diversity jurisdiction over Plaintiffs' state law claims. Furthermore, because the Court is recommending the *sua sponte* dismissal of Plaintiffs' complaint for lack of subject matter jurisdiction, the Court further recommends dismissing Plaintiffs' state law claims without prejudice and subject to refiling in state court and to reconsideration in the event Plaintiffs file a properly amended complaint that confers federal subject matter jurisdiction. *See Kolari v. New*

---

[6] Although Plaintiffs name Emery Law as a Defendant and attach several documents pertaining to Emery Law to their complaint (Dkt. No 2-5), the complaint lacks any specific allegations pertaining to Emery Law. (Dkt No. 1.)

*York Presbyterian Hosp.*, 455 F.3d 118, 120 (2d Cir. 2006) (district court has discretion to decline to exercise supplemental jurisdiction over state law claims because all claims over which the federal court has jurisdiction have been dismissed).

**B.    Opportunity to Amend**

Even when a plaintiff has failed to properly plead subject matter jurisdiction, courts in this Circuit, "generally afford an opportunity for amendment of the pleadings to cure defective jurisdictional allegations unless the record clearly indicates that the complaint could not be saved by any truthful amendment." *Durant*, 565 F.3d, at 65-66 (citation omitted).  Accordinlgy, in light of Plaintiffs' *pro se* status, the Court recommends that Plaintiffs' complaint (Dkt. No. 1) be dismissed in its entirety with leave to amend.[7]

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiffs' IFP application (Dkt. No. 3) is **GRANTED FOR PURPOSES OF FILING ONLY**, and it is

**RECOMMENDED** that Plaintiffs' complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY WITH LEAVE TO AMEND** for lack of subject matter jurisdiction and for failure to state a claim pursuant to 28 U.S.C. § 1915(e); and it is further

**ORDERED** that the Clerk provide to Plaintiffs a copy of this Order and Report-Recommendation, along with a copy of the unpublished decisions herein, in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

---

[7]  Because the status of the state foreclosure action is not clear from the complaint, the Court cannot consider the applicability of the *Rooker–Feldman* doctrine at this point.  *See Hoblock v. Albany Cnty. Bd. of Elecs.*, 422 F.3d 77, 84 (2d Cir.2005) (a federal district court does not have subject matter jurisdiction "over suits that are, in substance, appeals from state-court judgments.")

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: May 24, 2016
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2013 WL 840706
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

ACCD GLOBAL AGRICULTURE
INC. and Curt Meltzer, Plaintiffs,
v.
Alan P. PERRY and Farm Technologies
Network LLC, Defendants.

No. 12 Civ. 6286(KBF).
|
March 1, 2013.

*MEMORANDUM DECISION & ORDER*

KATHERINE B. FORREST, District Judge.

**\*1** "The district courts of the United States, as [the Supreme Court has] said many times, are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005). In most cases, federal jurisdiction lies either in the cause of action arising under federal law, or in the parties' citizenship being diverse-that is, from different states. While it is clear why federal courts should adjudicate cases implicating federal law, the rationale for so-called "diversity jurisdiction" is more historical. The drafters of the Judiciary Act were concerned that state court judges might employ improper local biases in adjudicating large-dollar cases brought by or against people from foreign states. *See id.* ("In order to provide a neutral forum for what have come to be known as diversity cases, Congress also has granted district courts original jurisdiction in civil actions between citizens of different States .... To ensure that diversity jurisdiction does not flood the federal courts with minor disputes, § 1332(a) requires that the matter in controversy in a diversity case exceed a specified amount, currently $75,000.") One wonders whether the fear of such local biases continues to justify the ability to access the federal courts, especially in light of the expertise one assumes state courts have over the issues of state law raised in diversity cases—and also in light of the overwhelming number of cases that make it into federal court on diversity grounds. Currently, however, diversity remains an open avenue to the federal courts, and the courts must adjudicate those cases validly brought pursuant to diversity jurisdiction.

That does not mean, however, that federal courts should accept allegations of diversity without investigation-indeed, federal courts are *mandated* to *sua sponte* examine their own jurisdiction at every stage in the litigation:

> Subject-matter jurisdiction can never be waived or forfeited ... [and] if courts become concerned about their own jurisdiction to hear cases, they have an independent *obligation* to ensure that they do not exceed the scope of their jurisdiction, and therefore they *must* raise and decide jurisdictional questions that the parties either overlook or elect not to press.

*Dumann Realty, LLC v. Faust,* 09 Civ. 7651, 2013 WL 30672, at *1 (S.D.N.Y. Jan.3, 2013) (quotation marks omitted) (citing *Gonzalez v. Thaler,* ──U.S. ──, ──, 132 S.Ct. 641, 648, 181 L.Ed.2d 619 (2012); *Henderson ex rel. Henderson v. Shinseki,* ── U.S. ──, ──, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011)) (emphasis supplied). This means investigating all aspects of the diversity requirements —not only whether all plaintiffs are completely diverse from all defendants, but also whether the amount in controversy reaches the statutory level.

Here, after having done just that, the Court determines that the requirements for diversity jurisdiction are not met. Plaintiffs ACCD Global Agriculture ("ACCD") and Curt Meltzer sue defendants Alan P. Perry and Farm Technologies Network LLC ("FTN") on claims arising from a soured business collaboration. But almost the entirety of plaintiffs' theory of damages is based on the projected profits lost from the collapse of that collaboration-a collaboration on an unproven business based on sophisticated new science, in an untested foreign market. Such damages require, however, more than the mere assurance from the entity itself that the profits were realizable and realistic—more than the mere *ipsidixit* of "I say I can make that money, therefore I can"—and instead require plaintiffs to eventually establish both the existence and amount of the profits allegedly lost to a reasonable certainty. *See Schonfeld v. Hilliard,* 218 F.3d 164, 172–75 (2d Cir.2000); *Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.,* 07 Civ. 7483, 2010 WL 4892646, at *8 (Dec. 2, 2010); *Pot Luck LLC v. Freeman,* 06 Civ. 10195, 2010 WL 908475, at *3 (S.D.N.Y. Mar.8, 2010).

**\*2** But plaintiffs' complaint here simply asserts that plaintiffs "would [have made] over $1 million per year in profits"—and makes no other proffer whatsoever concerning that allegation. This is insufficient to support a claim for lost profits, even at the motion to dismiss stage. And without those damages, the complaint does not allege an injury in excess of $75,000. Because plaintiffs have alleged absolutely no facts suggesting that their actual recoverable damages are any more than $12,157.08—far below the $75,000 required for diversity jurisdiction to lie—the Court lacks jurisdiction over this action and must dismiss it.

Accordingly, the Court dismisses this action *sua sponte* without prejudice, and denies defendants' motion to dismiss as moot.

## BACKGROUND

The following facts are drawn from the First Amended Complaint (the "FAC"), the documents attached thereto, and the documents incorporated therein, and are construed in the light most favorable to plaintiffs. *Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA,* ___ F.Supp.2d ___, 2012 WL 6062544, at \*1 (Dec. 7, 2012).

### The Parties and the Dispute

Plaintiff ACCD is an agricultural technologies company targeting international farming markets, and specifically China. (FAC ¶ 9.) Plaintiff Meltzer is the president, CEO, and a director of ACCD. (*Id.* ¶ 2.) Collectively as shareholders, Meltzer formed ACCD with defendant Perry, and two other individuals not involved in this lawsuit. (*Id.* ¶¶ 11, 16, 17.) Perry had worked in "crop production ... farming, agronomy, and soil sciences" for four decades, and served as vice president, treasurer, and a director of ACCD. (*Id.* ¶¶ 10, 11, 16, 18.) Perry was and is also the sole member and owner of defendant FTN—another soil sciences company. (*Id.* ¶¶ 12, 13.)

Meltzer had initially sought to pursue a business enterprise with Perry because of Perry's representations concerning his soil sciences expertise. (*See id.* ¶¶ 10, 13–15.) Specifically, Perry told Meltzer that his and FTN's soil science technology allowed for significant production improvements over regular farming techniques. (*Id.* ¶¶ 13–15.)[1] But Perry "failed to provide supporting data to ACCD" to

back up his representations, and—allege plaintiffs—those representations "were not accurate." (*Id.* ¶ 13; *see also id.* ¶¶ 14, 15.) Despite Perry's failure to provide ACCD with data, ACCD still "projected that one farm of 5,000 acres ... with Perry's alleged expertise ... would generate over $1 million per year in profits." (*Id.* ¶ 38.) The FAC contains no factual support or data whatsoever concerning the more-than-$1 million per-year-per-farm profits projected by ACCD.

In May 2011, Meltzer and Perry, and others, formed ACCD through execution of a "Shareholders Agreement." (*Id.* ¶ 11; *see also id.* Ex. 1 (the "Shareholders Agreement").) That agreement contained provisions, *inter alia:*

**\*3** • Requiring that Perry-and the other shareholders —devote "commercially reasonable" time to ACCD (Shareholder Agreement ¶ 7);

• Requiring that Perry license the FTN technology to ACCD for $1.00 per year—until such time as ACCD "accept[s] its initial funding," at which point requiring that Perry sell the technology to ACCD for $1.00, which would then license the technology to FTN for $1.00, provided that FTN use the technology only domestically (*id.* ¶ 8); and

• Requiring that a departing shareholder not compete with ACCD for two years, but permitting Perry to run FTN domestically provided he had no contact with ACCD's customers (*id.* ¶ 20).

By late 2011, however, the relationship between Meltzer and Perry had broken down. Perry allegedly interfered in various ways in ACCD's operations, (*see* FAC ¶¶ 23–27), and eventually resigned in December 2011. (*Id.* ¶ 28.) Due to that resignation, ACCD was denied "Perry's alleged expertise and his involvement and active participation." (*Id.* ¶ 38.) Accordingly, ACCD was alleged denied the projected more-than-$1 million per-year-per-farm profits the Meltzer/Perry collaboration would have generated.

### Facts Relating to Diversity Jurisdiction and Damages

Diversity jurisdiction in cases with domestic parties requires that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different states." 28 U.S.C. § 1332(a)(1). The parties on one side of the litigation must be completely diverse from the parties on the litigation's other side—that is, "no plaintiff can be a citizen of the same state as a defendant."

*Aurora Loan Servs. LLC v. Sadek,* 809 F.Supp.2d 235, 239 (S.D.N.Y.2011).

There is no dispute in this case that all plaintiffs are fully diverse from all defendants—plaintiffs are citizens of New York, and defendants are citizens of Maine. (FAC ¶¶ 1–4.)

There is also no present dispute amongst the parties as to the amount in controversy—defendants do not raise the issue in their pending motion to dismiss. But, the court's "independent obligation to ... raise and decide jurisdictional questions that the parties either overlook or elect not to press," *Henderson,* 131 S.Ct. at 1202, requires that the Court examine the FAC's damages allegations on its own.

Plaintiffs' allegations concerning injury, harm, or otherwise suggesting damages, are—*in toto*—the following:

- Perry interfered with ACCD's operations in late 2011 by (1) impeding ACCD's "testing efforts"; (2) failing to pursue business opportunities in Mexico; (3) failing to pursue "citrus greening trials"; (4) "pull[ing]" an employee off an ACCD project; (5) "hav[ing]" private conversations with" another employee [2]; and (6) "fail[ing] to set up private meetings for Meltzer with ... industry leaders." (FAC ¶¶ 23–26.) There is not a single allegation as to how these alleged harms affected ACCD, either in terms of dollar amounts or in terms of practical consequences.

*4  • Perry told Meltzer that Meltzer should restructure ACCD, however "Perry was not committed to the" restructuring, and "the restructuring was never completed." (*Id.* ¶¶ 34–35.) What affect this had on ACCD or Meltzer, in terms of dollars, is not alleged.

- Perry and FTN have been competing with ACCD in violation of the Shareholders Agreement. (*Id.* ¶¶ 36–37.) What affect this has had on ACCD or Meltzer, in terms of dollars or in terms of practical consequences, is not alleged.

- Meltzer "advanced" certain sums to Perry totaling $12,157.08 for certain business and personal expenses. Perry never paid Meltzer back. (*Id.* ¶¶ 31–33.)

- Due to Perry's alleged wrongful refusal to continue working with Meltzer and ACCD, ACCD has been unable to achieve its business plans. Specifically, "ACCD [had] projected that one farm of 5,000 acres under its management ... which [was] denied to ACCD by Perry's misconduct ... would generate over $1 million per year in profits to ACCD. Thus, ACCD's damages for its lost profits due to Perry's and FTN's misconduct are well in excess of $1 million." (*Id.* ¶ 38.)

### Procedural History

ACCD and Meltzer initially sued Perry and FTN on August 16, 2012. (ECF No. 1.) Defendants moved to dismiss, but before the Court ruled on that motion, plaintiffs filed the current FAC on October 12, 2012. (ECF No. 11.) Defendants then filed the current motion on October 26. That motion seeks dismissal of five of the FAC's seven counts—all on Rule 12(b)(6) grounds. (*See* ECF No. 13.) Shortly thereafter, on December 12, 2012, this action was transferred from Judge Barbara S. Jones to the undersigned. (ECF No. 17.)

### DISCUSSION

### Legal Standards

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2000); *see Williams v. Skyline Auto. Inc.,* 11 Civ. 8318, 2012 WL 1965334, at *2 (S.D.N.Y. May 24, 2012). To survive a Rule 12(b)(1) challenge to the Court's subject matter jurisdiction, the plaintiff must "allege facts that affirmatively and plausibly" suggest that jurisdiction exists. *Amidax Trading Grp. v. S.W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir.2011); *see GMA Accessories, Inc. v. Dorfman–Pacific Co., Inc.,* 11 Civ. 3731, 2012 WL 899385, at *3 (March 16, 2012) (dismissal is proper "when the complaint fails to allege sufficient allegations to support subject matter jurisdiction"). The Court draws all well-pleaded facts from the complaint— and the documents attached thereto and incorporated therein —assumes such facts to be true, and construes reasonable inferences in the plaintiffs' favor. *Amidax,* 671 F.3d at 145.

The constitutional and statutory basis for jurisdiction in a diversity case such as this one is found in 28 U.S.C. § 1332. That section requires that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different states." 28 U.S.C. § 1332(a)(1).

### Lost Profits Damages

**\*5** The only injury or damages alleged by the FAC, other than ACCD's lost profits, consists of the $12,157.08 Meltzer allegedly loaned or advanced Perry that Perry never paid back. Otherwise, the only damages articulated by plaintiffs are the "in excess of $1 million" of lost profits based on ACCD's alleged "project[ion] that one farm of 5,000 acres ... would generate over $1 million per year in profits." (*See* FAC ¶¶ 31–33, 38.)

A plaintiff may recover lost profits "only if he can establish both the existence and amount of such damages with reasonable certainty. The damages may not be merely speculative, possible or imaginary ... and must be capable of measurement based upon known reliable factors without undue speculation." *Schonfeld,* 218 F.3d at 172 (quotation marks and citations omitted). Thus, a party claiming lost profits must eventually prove that it would have been able to pursue its business venture on the price, cost, and quantity terms it contemplates. *See Ho Myung Moolsan,* 2010 WL 4892646, at *8. "A court should be hesitant ... to rely on stated assumptions as to the" operating success of a proposed business venture. *Id.; see Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.,* 98 Civ. 5101, 2004 WL 1594629, at *7 (S.D.N.Y. July 14, 2004) ("Courts repeatedly have rejected claims for lost profits that rest on a series of assumptions and projections.") (quotation marks omitted; collecting cases); *Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1070 (S.D.N.Y.1996) ("To award plaintiff lost profits based on the unproven assumption that it would have [succeeded in its business ventures] would unjustly reward plaintiff rather than make it whole.")

Moreover, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Schonfeld,* 218 F.3d at 172. Thus, "[p]rojections of future profits based upon a multitude of assumptions that require speculation and conjecture and few known factors do not provide the requisite certainty." *Id.; see Robin Bay Assocs., LLC v. Merrill Lynch & Co.,* 07 Civ. 376, 2008 WL 2275902, at *7 (S.D.N.Y. June 3, 2008) ("the obvious reason [is] that there does not exist a reasonable basis of experience upon which to estimate lost profits"). Indeed, for 100 years, the New York Court of Appeals has been "reluctant" to award lost profits in cases involving new business ventures. *See Cramer v. Grand Rapids Show Case Co.,* 223 N.Y. 63, 119 N.E. 227, 228–29 (N.Y.1918). [3]

Finally, if sought on breach of contract claims, [4] plaintiff must additionally eventually prove that "lost profit damages," specifically, "were within the contemplation of the parties when the contract was made." *Schonfeld,* 218 F.3d at 172; *Robin Bay,* 2008 WL 2275902, at *7 ("To recover lost profits the plaintiff must show both that the alleged loss is capable of proof with reasonable certainty and that the damages were fairly within the contemplation of the parties.").

**\*6** "Though courts often address the issue of lost profits at the summary judgment stage, New York courts have dismissed claims for lost profits where the pleadings suggest that an award of lost profits would require an unreasonable level of speculation." *Robin Bay,* 2008 WL 2275902, at *7 (on motion to dismiss, dismissing claims for lost profits arising from proposed construction of a casino in St Croix because "court would have to assume" that plaintiff would obtain funding to purchase land, secure proper licenses, complete construction, and operate the business profitably, when the industry was "in its infancy"); [5] *see also Pot Luck,* 2010 WL 908475, at *3 (on motion to dismiss, dismissing claims for lost profits arising from proposed distribution of film in certain regions because such claims would require the court to assume the existence of markets in those regions, the terms of any distributorship agreements in those regions, the efforts of retained distributors, and the effectiveness of those efforts); *Calip Dairies, Inc. v. Penn Station News Corp.,* 262 A.D.2d 193, 194, 695 N.Y.S.2d 70 (1st Dep't 1999) ("The cause of action for lost profits was also properly dismissed [on motion to dismiss under N.Y. C.P.L.R.] because the profits alleged to have been lost could not be determined with a reasonable degree of certainty."); *Lama Holding Co. v. Smith Barney Inc.,* 215 A.D.2d 314, 315, 627 N.Y.S.2d 33 (1st Dep't 1995; *676 R.S.D. Inc. v. Scandia Realty,* 195 A.D.2d 387, 387, 600 N.Y.S.2d 678 (1st Dep't 1993).

There is not a single allegation in the FAC in the case at bar suggesting that ACCD would ever have been profitable in China or the other international farming markets the FAC alleges were its targets. (*See* FAC ¶ 9.) As a preliminary matter, the Court notes that such allegations-well-pleaded, and with support—should not have been or be difficult for plaintiffs to produce. Indeed, it is *plaintiffs'* business whose profits are alleged to have been destroyed. It is there *plaintiffs* who should have the records and models and projections— without any need for discovery, or any other process—to

support any allegations that ACCD would have made the many millions in lost profits that plaintiffs claim.

But there is no allegation that ACCD could acquire land in China on which to operate any farms; nor that ACCD could acquire any Chinese legal rights or licenses to operate the farms; nor that technologically-advanced farming in China is even possible, practically or legally; nor that ACCD could build the farms; nor that ACCD could find laborers with the necessary experience with technologically-advanced farming; nor that ACCD could find laborers at all; nor that the FTN farming techniques would be effective.

Nor is there any well-pleaded allegation even that ACCD could operate the farms profitably. Indeed, there is no allegation that ACCD or Meltzer had ever been successful in any venture similar to ACCD. And while the FAC alleges that Perry told Meltzer that Perry had had success in prior similar ventures, the FAC *specifically alleges that Perry was lying when he made those representations.* (*See* FAC ¶¶ 13–15.) It seems odd to accuse an individual of lying about his credentials and, in the very next breath, claim damages based—essentially—solely on the withheld expertise of that individual. Likewise, the Court cannot— and will not—assume the effectiveness and profitability of unproven farming techniques that plaintiffs themselves allege were not as effective as they were represented to be.

**\*7** In the absence of well-pleaded allegations supporting any of the facts listed above, "there is simply no basis for the court to determine lost profits at this point or any other stage of the litigation because such a calculation would require a high degree of speculation." *Robin Bay,* 2008 WL 2275902, at \*8. Indeed, "a high degree of speculation" puts it lightly.

Plaintiffs' damages claims based on ACCD's alleged lost profits are therefore dismissed. The FAC is thus left with a claim for $12,157.08 in money Meltzer advanced Perry, which Perry never repaid. But this is below the $75,000 threshold required by 28 U.S.C. § 1332(a). Accordingly, the Court lacks subject matter jurisdiction and must dismiss this action.

CONCLUSION

For the reasons stated above, plaintiffs' FAC is dismissed. This dismissal is *without prejudice,* and plaintiffs are hereby granted leave to file a second amended complaint not later than March 11, 2013.

Defendants' motion to dismiss is denied as moot.

The Clerk of the Court is directed to terminate the motion at ECF No. 12.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 840706

Footnotes

1    Perry allegedly told Meltzer that his and FTN's technology provided (1) "at least a 30% increase in production for nearly every crop ... for 15 years"; (2) "crop yields of 20% to 100% over the traditional N, P, K fertilizer program; and (3) "high end yield increases (of up to over 120%) for 11 different crops." (FAC ¶¶ 13–15.)

2    The content of those conversations is not alleged.

3    "I have pointed out the limited business experience of plaintiffs, the fact that the enterprise was an adventure in a locality where neither one of them had before been engaged in business. No doubt the plaintiffs entertained hope that the business venture upon which they were about to embark would prove successful. Such expectation was evidently based upon a consideration of the resident population of the city of Amsterdam, the business activity of the residents of that city, and the number and character of competitors in the same general line of business. Plaintiffs, however, had no assurance that the venture would not prove to be a failure. At the time the contract was made they had the lease of a vacant unfinished store. They had not as yet purchased goods, placed goods on sale, or secured one customer. They had before them the labor of building up a new business. Nevertheless, the courts below have held that plaintiffs may recover for the breach of the contract such an amount of profits as they would have made had they not been prevented from starting in business, such damages not to be based upon a business theretofore carried on, but measured by profits during a period of time corresponding to the period of interruption one year later. Therein material error was committed.
    ..."

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    5

2013 WL 840706

A distinction exists between the interruption of an established business and a new venture. The owner of an established business may have it in his power to establish with reasonable certainty the amount of capital invested, the monthly and yearly expenses of operating his business, and the daily, monthly, or yearly income he derived from it for a long time prior thereto and for the time during which the interruption of which he complains continued, thereby furnishing a reasonably correct estimate of the nature of the legal injury and the amount of damages which resulted therefrom. While evidence of such facts may be admissible they must not be uncertain or problematical. The requirement imposed upon one whose business has been established and interrupted cannot be enforced as to him and made less stringent to one embarking in a new business who cannot furnish data of past business from which the fact that anticipated profits would have been realized can be legally deduced." 119 N.E. at 228–29 (internal citations omitted).

4    Plaintiffs' FAC lists seven counts—some of which are plead "in the alternative" from each other—including one for breach of contract. Because no count includes a statement of the damages arising from that count, it is impossible for the Court to determine what damages claims are linked to which legal counts.

5    Indeed, the *Robin Bay* case is particularly instructive because there—like in the case at bar—the party against whom lost profits were claimed acted in the venture as an adviser without whom the venture could not proceed for lack of the venturers' expertise. Moreover, like this case, the claims in that case arose under contract, negligence, and fiduciary duty theories. *See* 2008 WL 2275902, at ——1–2, 7–8.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 30672
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

DUMANN REALTY, LLC, Profitechnic Limited,
LLC, Lawrence Luk and Mac Luk, Plaintiffs,
v.
Frederick FAUST, Defendant/
Counterclaim Plaintiff,
v.
Dumann Realty, LLC, Richard Du and
Mac Luk, Counterclaim Defendants.

No. 09 Civ. 7651(JPO).
|
Jan. 3, 2013.

*MEMORANDUM AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Dumann Realty, LLC ("Dumann" or "the LLC"), Profitechnic Capital Limited ("Profitechnic"), Lawrence Mac ("Mac"), and Mac Luk (together, "Plaintiffs") brought this action against Dumann member Frederick Faust ("Faust" or "Defendant") asserting nine claims under New York State Law, including breach of Dumann's Operating Agreement and breach of the common law duty of good faith and fair dealing. Faust has filed several counterclaims against Plaintiffs, also under New York law.

Defendant has filed a motion for summary judgment, which is now fully briefed. However, this Court has determined that it lacks subject matter jurisdiction over this matter, and thus must dismiss this case *sua sponte,* without reaching the merits of Defendant's motion.

### I. Subject Matter Jurisdiction

"The district courts of the United States ... are 'courts of limited jurisdiction. They possess only that power authorized by Constitution and statute.' " *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (quoting *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)). "Plaintiffs bear the burden of

showing by a preponderance of the evidence that subject matter jurisdiction exists. [J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir.2003) (internal quotation marks and citations omitted; alteration in original).

"Subject-matter jurisdiction can never be waived or forfeited. The objections may be resurrected at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety." *Gonzalez v. Thaler,* ——— U.S. ———, ———, 132 S.Ct. 641, 648, 181 L.Ed.2d 619 (2012). Moreover, if courts become concerned about their jurisdiction to hear cases, they have "an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Hernandez ex rel. Hernandez v. Shinseki,* ——— U.S. ———, ———, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011) (citation omitted); *see also Alliance of American Insurers v. Cuomo,* 854 F.2d 591, 605 (2d Cir.1988) (stating that "a challenge to subject matter jurisdiction cannot be waived and may be raised *sua sponte* by the district court" (citation omitted)). To be sure, if it is determined late in the life of a case that no subject matter jurisdiction exists, "many months of work on the part of the attorneys and the court may be wasted." *Henderson,* 131 S.Ct. at 1202. This, however, is a modest price to pay for the continued preservation of federalism. *Accord Mansfield, C. & L.M. Ry. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884) (explaining that the rules governing subject matter jurisdiction "spring[ ] from the nature and limits of the judicial power of the United States" and are therefore "inflexible and without exception").

### II. Diversity Jurisdiction in Cases Involving Limited Liability Companies

**\*2** In their Second Amended Complaint, Plaintiffs allege that "[t]his Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 based upon the diversity of citizenship of each of the parties and the amount in controversy." (Second Amended Complaint at ¶ 11.) Under 28 U.S.C. § 1332(a) (1), federal diversity jurisdiction exists where the matter is between "citizens of different States." Since *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806), it has been settled law that there must be complete diversity between all plaintiffs and all defendants.

A Limited Liability Company ("LLC") is completely diverse from opposing parties only if *all* of the members of the LLC are citizens of different states than *all* opposing parties. *See Handelsman v. Bedford Vill. Assocs. Ltd. P'ship,* 213 F.3d 48, 51 (2d Cir.2000) ("defendants Bedford Partnership and Bedford LLC are, for diversity purposes, citizens of Florida because both entities have Florida members"); *Receivables Exch., LLC v. Hotton,* No. 11 Civ. 0292(JS)(WDW), 2011 WL 239865, at *1 (E.D.N.Y. Jan. 21, 2011) (explaining that, "for diversity purposes, an LLC is a citizen of every state that its members are citizens of" (citations omitted)); *Castillo Grand LLC v. Sheraton Operating Corp.,* No. 09 Civ. 7197(RPP), 2009 WL 4667104, at *1 (S.D.N.Y. Dec.9, 2009) ("For purposes of assessing diversity jurisdiction, an unincorporated entity such as a partnership or a limited liability company is deemed to be a citizen of all states of which its partners or members are citizens." (citation omitted)); *cf. Carden v. Arkoma Assocs.,* 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990) (holding that, in the context of limited partnerships, citizenship of limited partners had to be taken into account to determine diversity of citizenship among the parties).

In his recent submission to this Court, Richard Du avers that that, as of the filing of the initial Complaint on September 2, 2009, two of the original three members, Du and Luk, were both citizens of New York, while Faust, who is both an original member of Dumann and the defendant in this action, was a domiciliary of Pennsylvania. (Dkt. No. 96 ("the Du Affidavit") at ¶¶ 3, 5–6.) [1] Du states, however, that Faust "resigned as a member" of the LLC on March 18, 2009, over five months before the initial Complaint was filed. (Du Affidavit at ¶ 2.) [2] This begs the question whether Faust must be considered a member of Dumann for the purpose of determining whether the parties are completely diverse.

### III. State Law and LLC Membership

The question of whose citizenship constitutes part of the LLC's citizenship is ultimately governed by the law of the state of incorporation. This is illuminated by *CR Holding Company, LLP v. Campbell,* No. 11 Civ.2051(JWL), 2011 WL 2357649, at *3 (D.Kan. June 3, 2011), a case whose facts are remarkably similar to this case. *Campbell* concerned a dispute between several limited partnerships and their former partner, the defendant Campbell. The sole remaining partner, Renkemeyer, was a citizen of Kansas, while Campbell was a citizen of Missouri. In his motion to dismiss for lack of subject matter jurisdiction, Campbell argued

**\*3** that diversity is not complete because [Campbell] remains a partner of each of the plaintiff entities such that the plaintiff entities are citizens of both Kansas and Missouri, thereby destroying complete diversity ... Plaintiffs, however, contend that Mr. Renkemeyer is the sole partner of each entity because Mr. Campbell has either withdrawn from the partnerships or, under the circumstances, should be deemed dissociated ....

*Id.* at *1.

In determining whether subject matter jurisdiction existed, Judge Lungstrum looked to the Kansas state law on partner withdrawal from limited partnerships, which provided that withdrawal was impermissible unless it was provided for by the partnership agreement. *Id.* at *2. "[B]ecause defendant is not permitted to withdraw as a limited partner of Renkemeyer Campbell LP under the agreement itself and, thus, by statute ...," Judge Lungstrum held, "defendant remains a limited partner .... That entity, then, is a citizen of both Kansas and Missouri, thereby destroying complete diversity." *Id.* at *3. In other words, despite Campbell's attempted withdrawal, the LLC remained a citizen of Campbell's place of citizenship.

Though less squarely on point, *Tri–County Metropolitan Transportation District of Oregon v. Butler Block, LLC,* No. 08 Civ. 259(AA), 2008 WL 2037306 (D.Or. May 7, 2008), is also informative. In *Butler Block,* Judge Aiken wrestled with the question whether an Oregon plaintiff was completely diverse from the defendant, a parent LLC composed of a California citizen and a child LLC with one member, an Oregon citizen. The defendant LLC argued that its Oregon LLC member did not destroy complete diversity, because the child LLC had been administratively dissolved under Oregon law for failure to pay its fees. *Id.* at *2. However, Judge Aiken held that neither Delaware state law [3] nor the parent LLC agreement permitted withdrawal of a member due to administrative dissolution. Further, "under Delaware law," as under New York law, "unless an LLC agreement provides otherwise, a member may not resign from a limited liability company prior to the dissolution and winding up of the limited liability company." *Id.* at *2 (internal quotation marks and citation omitted). Thus, even if Oregon no longer recognized the existence of the child LLC, the child LLC continued to exist under Delaware law, and the citizenship of its

member destroyed diversity. *Butler Block,* then, underscores the principle laid out in *Campbell:* the law of the state of incorporation plays a central role in the determination of whether complete diversity can exist between an LLC and an opposing party.

Armed with *Campbell* and *Butler Block,* this Court can now turn to the case at hand. It is undisputed that Dumann, the LLC, was formed in New York and is governed by New York Limited Liability Company Law ("NYLLCL"). (*See* Dkt. No. 85, Ex. A ("Operating Agreement") at III § 1 ("Unless specifically set forth otherwise in the Articles of Organization or by amendment thereto, management of this Company shall be vested in the members, who shall be subject to all of the rights, duties, privileges and liabilities of the Managers, as set forth in the New York Limited Liability Company Law .") NYLLCL § 606(a) provides in relevant part:

> **\*4** A member may withdraw as a member of a limited liability company only at the time or upon the happening of events specified in the operating agreement and in accordance with the operating agreement. Notwithstanding anything to the contrary under applicable law, unless an operating agreement provides otherwise, a member may not withdraw from a limited liability company prior to the dissolution and winding up of the limited liability company.

*See also Klein v. 599 Eleventh Ave. Co.,* 14 Misc.3d 1211(A), at \*3 (N.Y.Sup.2006) (explaining that "a member may withdraw from a limited liability company only as provided in its operating agreement. If the operating agreement is silent, a member may not withdraw prior to the dissolution of the company." (citations omitted)).

The Operating Agreement contains the following rules about withdrawal:

> A member may withdraw as a member of this Company with the vote or written consent of at least two-thirds in interest of the members, other than the member who proposes to withdraw as a member. If such consent is not given, a member may withdraw upon

not less than six months prior written notice to this Company, provided such withdrawal does not breach this Operating Agreement, and the New York Limited Liability Company Law or any other contractual obligation between such proposed withdrawing member and this company or its other members. Should such breach occur, then the withdrawing member may be liable for damages as a result thereof.

(Operating Agreement at III, § 10.)[4] Read together, the NYLLCL and the Operating Agreement do not permit member withdrawal, unless (1) two-thirds consent is given or (2) the withdrawal occurs after six months' notice.

Here, Faust did not obtain two-thirds consent to withdraw. Nor did he provide six months' notice before withdrawal; indeed, this is the *very basis* of Dumann's contention that Faust breached the membership agreement. (*See* Second Amended Complaint at ¶¶ 17–18.)[5] Because Faust has not withdrawn under one of the two methods enumerated in the Operating Agreement, his "resignation" from Dumann was, in short, ineffective.[6] Thus, when Plaintiffs brought this suit, Dumann's citizenship for diversity jurisdiction purposes was both New York and Pennsylvania. Pennsylvania, in other words, finds itself "on both sides of the 'v.' sign" in this matter, *Saavedra v. Boeing Co.,* 464 F.Supp.2d 770, 771 (N.D.Ill.2006), meaning that diversity of citizenship is incomplete.

The infirmity in this Court's subject matter jurisdiction over this case is a subtle one, which may explain why it has gone unnoticed throughout much of the litigation. Nevertheless, that infirmity divests this Court of the power to adjudicate this case as a matter of federal law.

## IV. Conclusion

For the foregoing reasons, this case is DISMISSED *sua sponte* for lack of subject matter jurisdiction. The Clerk of the Court is directed to terminate the case and all pending motions.

**\*5** SO ORDERED.

2013 WL 30672

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 30672

Footnotes

1   While the Second Amended Complaint alleges that Dumann has its "principal place of business" in New York State, that fact (as to an LLC) is entirely irrelevant to diversity jurisdiction. The Second Amended Complaint does not enumerate the citizenship of the members of Dumann at the time the suit was filed.

On December 6, 2012, this Court issued an issued an Order to Show Cause why Plaintiff's Second Amended Complaint should not be dismissed for lack of subject matter jurisdiction ("the Order"). The Order directed Plaintiffs to both "enumerate every Member of the LLC as of the original date of this action's filing, and ... specify the *citizenship* of each Member." *Dumann Realty LLC v. Faust,* No. 09 Civ. 7651(JPO), 2012 WL 6135020, at *1 (S.D.N.Y. Dec.6, 2012). On December 19, 2012, Plaintiffs filed an affidavit by Richard Du. On December 28, 2012, Defendant filed an affidavit by Anthony R. Molé in reply. (Dkt. No. 97 ("Molé Affidavit").)

2   As Defendant rightly notes (*see* Molé Affidavit at ¶¶ 4–7), the Du Affidavit's contention that Faust "resigned as a member" is problematic on its own terms. Du relies on paragraph 23 of Faust's Answer to the Second Amended Complaint for the proposition that Faust resigned from Dumann; however, that paragraph states not that Faust resigned, but that "on or about March 18, 2009, by letter, Faust indicated his *desire* to resign from Dumann and requested that Dumann's remaining members, Du and Luk, consent to his resignation." (Du's Affidavit, Ex. A at ¶ 23 (emphasis added).)

3   The defendant LLC was a Delaware LLC governed by Delaware law. *Id.* at *1.

4   Moreover, the Operating Agreement "has (no) specified date of dissolution ... unless sooner dissolved pursuant to this Agreement or pursuant to the provisions of the [NYLLCL]." (*Id.* at § II, 7.)

5   As Defendant's counsel notes, this puts Plaintiff "in a situation where any argument made in an attempt to support diversity subject matter jurisdiction would be counterproductive to their claim." (Molé Affidavit at ¶ 9.)

6   Moreover, Dumann sued Faust within six month of his resignation, meaning that the period during which the Operating Agreement anticipated Faust to be liable for consequential damages of the breach was still in effect. This underscores that, at the time this Complaint was filed, Faust was a member of the LLC for purposes of diversity jurisdiction.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 918107
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

ENSIGN YACHTS, INC, Plaintiff,
v.
JON ARRIGONI et al., Defendants.

Civil Action No. 3:09–cv–209 (VLB).
|
March 11, 2010.

**Attorneys and Law Firms**

Frederick A. Lovejoy, Lovejoy & Associates, Easton, CT, for Plaintiff.

Michael P. Kenney, Steven H. Malitz, Leclairryan, Hartford, CT, for Jon Arrigoni.

David L. Woodard, Moukawsher & Walsh, Hartford, CT, for Certain Underwriters at Lloyds of London.

Christopher B. Weldon, Darren P. Renner, Keidel, Weldon & Cunningham, LLP, White Plains, NY, for Saperstein Agency, Inc.

*MEMORANDUM OF DECISION AND ORDER GRANTING DEFENDANT JON ARRIGONI'S MOTION TO DISMISS [Doc. # 36] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS LLOYDS OF LONDON'S AND SAPERSTEIN AGENCY'S MOTIONS TO DISMISS [Doc.32, 34]*

VANESSA L. BRYANT, District Judge.

**\*1** The Plaintiff, Ensign Yachts, Inc. ("Plaintiff" or "Ensign") brings this action for damages against the Defendants, Jon Arrigoni ("Arrigoni"), Arrigoni's underwriter Lloyds of London ("Lloyds"), and Lloyds' purported agent the Saperstein Agency, Inc. ("Saperstein"). This case involves the transit of the Plaintiff's 2008 55′ Cigarette Super Yacht from New Jersey to Florida in December 2007. The Plaintiff alleges that the vessel was damaged during transit while in the custody of Arrigoni as a result of Arrigoni's negligence. Ensign asserts claims against three parties. First, it asserts claims against Arrigoni for breach of contract, violation of the Carmack Amendment

to the Interstate Commerce Act (49 U.S.C. § 14706), breach of implied contract, negligence, breach of the covenant of good faith and fair dealing, loss of sale, and breach of the Connecticut Unfair Trade Practices Act ("CUTPA") (Conn. Gen.Stat. § 42–110b et seq.). Second, Ensign asserts claims against Saperstein for breach of contract, breach of the covenant of good faith and fair dealing, bad faith, fraud, breach of the Connecticut Unfair Insurance Practices Act ("CUIPA") (Conn. Gen.Stat. § 38a–815 et seq.), tortious interference, breach of CUTPA, and loss of sale. Finally, Ensign asserts claims against Lloyds for breach of contract, bad faith, breach of the covenant of good faith and fair dealing, fraud, breach of CUIPA, breach of CUTPA, and loss of sale.

Presently pending before the Court are three separate motions to dismiss filed by Arrigoni [Doc. # 36], Lloyds [Doc. # 34], and Saperstein [Doc. # 32]. For the reasons stated below, Arrigoni's motion to dismiss is GRANTED. Lloyds' and Saperstein's motions to dismiss are GRANTED IN PART and DENIED IN PART.

**I.** *FACTUAL AND PROCEDURAL BACKGROUND*

The Plaintiff's Amended Complaint alleges the following facts relevant to the pending motions to dismiss. Ensign entered into various agreements with Cigarette Super Yachts, which led to a joint venture under the name Cigarette Racing Team ("Cigarette"). The purpose of the joint venture was to market and sell a 2008 Model Year, 55′ Cigarette Super Yacht (the "Yacht"). Sometime thereafter, Cigarette assigned and/or transferred all of its rights in the Yacht to Ensign. In October 2007, Ensign entered into a brokerage agreement with Xtreme Games Watersports ("Xtreme") for the purpose of selling the Yacht. In December 2007, Masterski Pilou Agency ("Masterski"), a client of Xtreme, agreed to purchase the Yacht for a price of $1,200,000.

In furtherance of the sales agreement with Masterski, Ensign arranged for the Yacht to be transported from Jersey City, New Jersey to Miami, Florida. Upon its arrival in Miami, Ensign planned to deliver the Yacht to Masterski in St. Barthelemy, French West Indies. Ensign contacted Jon Arrigoni of Arrigoni Marine Movers to transport the Yacht. Arrigoni indicated that he had the requisite skills and experience to do the job. Ensign advised Arrigoni that the fair market value of the Yacht was in excess of $1,000,000, and requested that Arrigoni obtain insurance to be issued in

Ensign's name. Arrigoni contacted Lloyds, which issued an insurance policy for the sum of $1,000,000. Subsequently, Arrigoni acquired a Certificate of Liability Insurance from Saperstein identifying Cigarette as the certificate holder.

**\*2** During transit by Arrigoni, the Yacht became dislodged from the trailer that Arrigoni was using to transport it and was dragged along the highway, causing substantial damage to the Yacht's hull and equipment and diminishing its value. Prior to September 15, 2008, Ensign advised the defendants, including Lloyds' agents Lloyds of America and Penobscot Group, of its claim for damages to the Yacht, as well as other potential losses related to the sale of the Yacht. This was done so that the Yacht could be quickly repaired at the expense of Lloyds, as Ensign did not have sufficient funds to pay for the initial repairs, estimated to cost $100,000, and so that Masterski would not cancel its agreement to purchase the Yacht. Ensign contracted with Norseman Shipbuilding Corporation ("Norseman") to repair the Yacht. Masterski nevertheless cancelled the purchase agreement. Norseman completed its repairs of the Yacht on April 3, 2008. Defendants Lloyds and Saperstein and their agent Penobscot Group refused to deal with the public adjuster that Ensign had retained to speed along adjustment of the claim, and failed to contact Ensign to deal with it personally. According to Ensign, Lloyds and Saperstein and their agents entirely refused to cooperate in the claims process and adjust the claim, and ultimately denied the claim without providing a reason for the denial to Ensign.

Ensign alleges that Lloyds or its agent Lloyds of America employed Saperstein as their agent/broker for the purpose of soliciting insurance policies to be issued by Lloyds and to handle claims submitted by their insureds. Ensign further alleges that Lloyds and Saperstein are not authorized to do business in Connecticut, but that they nonetheless conducted the business of insurance within Connecticut. Specifically, Ensign claims that these Defendants issued a Certificate of Liability Insurance dated December 17, 2007, binding insurance covering Ensign, but they were not authorized to conduct the business of insurance in Connecticut or to solicit or sell policies of insurance to individuals or entities in Connecticut. Ensign asserts that Lloyds and Saperstein knew or should have known that they were not authorized to engage in the business of insurance in Connecticut, and therefore they were in violation of Connecticut law when they issued insurance to Arrigoni and Ensign.

Because Ensign did not have sufficient funds to pay Norseman, and because Lloyds and Saperstein refused to adjust and pay Ensign's claim, on July 23, 2008, Norseman filed a complaint in the Federal District Court for the Southern District of Florida (Docket No. 08–22073) to have the Yacht arrested in order to protect and secure its maritime lien. Ensign borrowed money to pay Norseman for its services, and the Yacht was released from arrest by Court Order on August 8, 2008.

After the Yacht was released from arrest, Ensign again marketed it for sale. However, the market for vessels of this type had deteriorated substantially and the Yacht suffered additional damages that further diminished its value. The Yacht was eventually sold in December 2008 for the sum of $750,000.

**\*3** Ensign brought suit in this Court on February 4, 2009. Ensign filed an Amended Complaint on March 16, 2009. Saperstein filed its motion to dismiss for lack of jurisdiction and failure to state a claim on April 16, 2009. Lloyds and Arrigoni separately filed motions to dismiss for failure to state a claim on April 17, 2009. Ensign filed a joint objection to all three motions on June 11, 2009. Following a prejudgment remedy hearing, by Order dated November 19, 2009, the Court granted a prejudgment remedy of attachment and garnishment against Arrigoni only in the amount of $728,726.72. *See* Doc. # 97.

## II. *DISCUSSION*

### A. *Standard of Review*

The Supreme Court clarified the standard governing a motion to dismiss for failure to state a claim in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), stating that, "[u]nder Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Id.* at 1949. While Rule 8 does not require detailed factual allegations, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

### B. *Carmack Preemption*

#### 1. *Arrigoni*

Arrigoni moves to dismiss all state statutory and common law claims asserted against him on the basis that these claims are preempted by the Carmack Amendment because they arise from interstate transportation services. "It is well established that the Carmack Amendment preempts state law claims arising from the shipment of goods in interstate commerce." [1] *Design X Mfg., Inc. v. ABF Freight Systems, Inc.,* 584 F.Supp.2d 464, 467 (D.Conn.2008). As the Second Circuit has explained:

> In enacting [the Carmack Amendment], Congress intended to provide interstate carriers with reasonable certainty and uniformity in assessing their risks and predicting their potential liability. The Carmack Amendment did this both by establishing a single uniform regime for recovery by shippers directly from [the] interstate common carrier in whose care their [items] are damaged, and by preempting [the] shipper's state and common law claims against a carrier for loss or damage to goods during shipment.

*Project Hope v. M/V Ibn Sina,* 250 F.3d 67, 74 n. 6 (2d Cir.2001) (internal citations and quotation marks omitted); *see also Cleveland v. Beltman North American Co., Inc.,* 30 F.3d 373, 374 (2d Cir.1994) (holding that claims by a shipper for damage to goods in interstate commerce is an "area of interstate commerce law that has been fully occupied by Congress' passage of a statute delineating what remedies are available, leaving no room for additional state or federal common law causes of action").

 *4 Ensign argues that its state law claims against Arrigoni are not preempted because, in addition to entering an agreement with Arrigoni to transport the vessel, it also entered into a second agreement with Arrigoni to procure proper insurance by having Ensign named as an additional insured. According to Ensign, its claims based upon Arrigoni's failure to procure the agreed-upon insurance coverage, failure to prosecute his rights against Lloyds and Saperstein, and failure to commence suit or file a third-party complaint against Lloyds and Saperstein in order to enforce the rights he agreed to obtain on behalf of Ensign are not preempted by the Carmack Amendment.

In making this argument, Ensign relies primarily upon the Seventh Circuit's decision in *Gordon v. United Van Lines, Inc.,* 130 F.3d 282 (7th Cir.1997). There, the Seventh Circuit held that "the Carmack Amendment does not preempt those state law claims that allege liability on a ground that is separate and distinct from the loss of, or the damage to, goods that were shipped in interstate commerce." *Id.* at 289. The plaintiff in *Gordon* was an elderly woman in failing physical health. *Id.* at 284. Her vision and hearing were impaired, and she could no longer write due to arthritis. *Id.* The plaintiff contacted a United Van Lines agency in Florida for the purpose of arranging delivery of some of her belongings to her new apartment in Chicago, and other of her belongings to her daughter's home. *Id.* She met with a United Van Lines agent, who was aware of her physical impairments, and she instructed him regarding delivery. *Id.* The agent never obtained the plaintiff's agreement regarding insurance against the loss of her possessions, and instead wrote in the bill of lading that the plaintiff released United from liability for loss or damage to the goods exceeding $1,000. *Id.* United never delivered any of the goods destined for her daughter's home. *Id.* Instead, the items were inadvertently discarded and incinerated. *Id.* at 285. Rather than acknowledging their error, for a period of several months United represented to the plaintiff and her daughter that the items were in their warehouse and would be safely delivered. *Id.*

Based upon these facts, the Seventh Circuit reversed the district court's dismissal of the plaintiff's claim for intentional infliction of emotional distress, finding that this claim alleged a harm to the plaintiff that was independent from the loss or damage to her goods and therefore was not preempted by the Carmack Amendment. *Id.* at 289. However, the Seventh Circuit upheld the district court's dismissal of the plaintiff's claims for breach of contract, willful and wanton misconduct, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and common law fraud. The Seventh Circuit found that claims "relating to the making of the contract for carriage, and the measure of damages for such claims are so likely to be the loss or damage to the goods, that they are ... preempted by the Carmack Amendment." *Id.* In addition, the Seventh Circuit found that claims asserting fraud in the claims handling process were also preempted by the Carmack Amendment because "the claims process is directly related to the loss or damage to the goods that were shipped. Indeed, people would not be involved in the process unless either loss or damage had occurred." *Id.* at 290.

**\*5** Numerous district courts have reached the same conclusion as the Seventh Circuit in *Gordon,* holding that the Carmack Amendment preempts statutory and common law claims against carriers arising from the claims process, including claims of fraud relating to insurance coverage. *See, e.g., Design X Mfg.,* 584 F.Supp.2d at 467 (holding that breach of contract, negligence, and CUTPA claims against carrier asserting damages to business or reputation were preempted by the Carmack Amendment because the alleged damages "flowed directly from the damage to the goods shipped in interstate commerce and the subsequent claims process"); *Shabani v. Classic Design Servs., Inc.,* 2010 WL 446084, at \*2 (C.D.Cal. Feb. 8, 2010) (acknowledging that "the preemptive effect of the Carmack Amendment applies equally to claims of fraud relating to insurance coverage, and holding that claim alleging that carrier "intentionally and fraudulently misrepresented" that it had procured insurance for damaged item was preempted); *Nichols v. Mayflower Transit, LLC,* 368 F.Supp.2d 1104, 1108–09 (D.Nev.2003) (dismissing claims asserting that carrier sold "insurance" and acted in bad faith when refusing to pay plaintiff's claim); *Hanlon v. United Parcel Serv.,* 132 F.Supp.2d 503, 505–06 (N.D.Tex.2001) (holding that the Carmack Amendment preempted plaintiff's claims against carrier for deceit for fraudulent insurance fee collection, unauthorized operation as an insurance company, and violations of the Texas Insurance Code).

Here, all of the state law claims that Ensign asserts against Arrigoni in its Amended Complaint seek to recover damages arising from the shipment of its Yacht in interstate commerce. Although Ensign attempts to characterize these claims as alleging liability on a ground that is separate and distinct from the damage to its Yacht, the very authority it cites supports the dismissal of these claims. Ensign complains that Arrigoni misrepresented that he had procured adequate insurance to cover the risks associated with the interstate transport of the Yacht. Ensign further complains that Arrigoni failed to prosecute his rights against Lloyds and Saperstein, and failed to commence suit or file a third-party complaint against Lloyds and Saperstein in order to enforce the rights he agreed to obtain on behalf of Ensign. However, claims against carriers for misrepresentations relating to insurance coverage and misrepresentations made in connection with the claims handling process are directly related to the damage to the shipped goods, and are therefore preempted by the Carmack Amendment. *See Gordon,* 130 F.3d at 290; *see also Rini v. United Van Lines, Inc.,* 104 F.3d 502, 506 (1st Cir.1997) ("Preempted sate law claims ... include all liability

stemming from damage or loss of goods, liability stemming from the claims process, and liability related to the payment of claims."). Accordingly, since the Carmack Amendment preempts each of Ensign's state statutory and common law claims against Arrigoni, these claims are dismissed. [2]

## 2. *Lloyds*

**\*6** Lloyds also argues that Ensign's state law claims against it are preempted by the Carmack Amendment. Unlike Arrigoni, Lloyds is not alleged to be a Carmack carrier, but instead is an insurance company. As discussed above, the purpose of the Carmack Amendment was "to provide interstate *carriers* with reasonable certainty and uniformity in assessing their risks and predicting their potential liability." *Project Hope,* 250 F.3d at 74 n. 6 (emphasis added); *see also Missouri Pac. R. Co. v. Elmore and Stahl,* 377 U.S. 134, 137 (1964) (stating that the Carmack Amendment "codifies the common-law rule that a carrier, *though not an absolute insurer,* is liable for damages to goods transported by it unless it can show that the damage was caused by '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods' ") (emphasis added). Lloyds points to nothing in the text of the Carmack Amendment or the statute's legislative history which suggests that by its enactment Congress intended to preempt a shipper's state law claims against an insurance company which allegedly had assumed a direct contractual obligation to insure the risk of loss during transport of the shipper's goods. Nor does Lloyds cite any cases establishing that a shipper's claims against an insurer of the carrier are preempted by the Carmack Amendment where that insurer allegedly assumed a direct contractual obligation to the shipper.

Indeed, other district courts have held that, because the Carmack Amendment is concerned predominately with the liability of carriers, it does not preempt actions against non-carrier entities arising out of the interstate shipment of goods. *See Commercial Union Ins. Co. v. Forward Air, Inc.,* 50 F.Supp.2d 255, 257–59 (S.D.N.Y.1999) (holding that a property broker, which arranged for shipping but did not act as a carrier, could be held liable under state or federal common law given the existence of a savings clause in the Carmack Amendment and the focus of precedent on carrier liability); *Taylor v. Allied Van Lines,* No. CV–08–1218–PHX–GMS, 2008 WL 5225809, at \*3–\*4 (D.Ariz. Dec. 15, 2008) (holding that "the Carmack Amendment was not intended to preempt all actions against non-carrier entities

arising out of the interstate shipment of goods simply because a statutory cause of action is also available against the carrier"); *Custom Cartage, Inc. v. Motorola, Inc.,* No. 98–C–5182, 1999 WL 89653, at *3 (N.D.Ill. Feb. 16, 1999) (stating that the Carmack Amendment's silence as to the liability of non-carrier entities "does not mean that the Carmack Amendment grants entities which arrange for the transportation of goods absolute immunity for breach of contract or tort actions arising out of the interstate shipment of goods").

Further, because Ensign asserts CUIPA claims against Lloyds and Saperstein, a holding that the Carmack Amendment preempts all of Ensign's state law claims against these Defendants would arguably run afoul of the McCarran–Ferguson Act, which provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b); *see generally Couch on Insurance* 3d § 2:4. Accordingly, the Court holds that Ensign's state law claims against Lloyds are not preempted by the Carmack Amendment. [3]

### C. *Subject Matter Jurisdiction*

**\*7** Saperstein first argues that all of Ensign's claims against it must be dismissed for lack of subject matter jurisdiction. According to Saperstein, the Court lacks subject matter jurisdiction over Ensign's claims against it because both Ensign and Saperstein are incorporated in New York, and therefore there is a lack of complete diversity of citizenship pursuant to 28 U.S.C. § 1332(a). The Court first notes that complete diversity exists under § 1332 only where all plaintiffs are citizens of different states than all defendants. *See Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 553 (2005) (citing *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806)).

Here, the Amended Complaint invokes the Court's jurisdiction on multiple grounds. Although Saperstein correctly contends that "diversity jurisdiction is available only when all adverse parties to a litigation are completely diverse in their citizenships," *Herrick Co., Inc. v. SCS Communications, Inc.,* 251 F.3d 315, 322 (2d Cir.2001), the lack of complete diversity in this case would not end the Court's inquiry, nor need the Court address the diversity argument because Ensign asserts alternative bases

for jurisdiction. A federal court's jurisdiction is not limited only to cases in which there is diversity of citizenship. As a general matter, the term "jurisdiction" means those cases falling within the Court's adjudicative authority. *See Kontrick v. Ryan,* 540 U.S. 443, 455 (2004). Federal courts are tribunals of limited jurisdiction whose adjudicative authority is limited to cases the adjudication of which is authorized by the Constitution and Congress. *See Kokkoken v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377 (1994); *Finley v. United States,* 490 U.S. 545, 547–58 (1989). Federal courts are presumptively without jurisdiction and the burden of proving that the Court has jurisdiction is on the party seeking to invoke the Court's jurisdiction. *Kokkoken,* 511 U.S. at 377. Congress has conferred jurisdiction upon federal district courts pursuant to 28 U.S.C. § 1330 et seq. Section 1331 confers district courts with general federal question jurisdiction, which includes jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; U.S. Const., art. III, § 2.

The Amended Complaint asserts that this Court has federal question jurisdiction over Ensign's Carmack claim under 28 U.S.C. § 1331, and supplemental jurisdiction over its state law claims pursuant to 28 U.S.C. § 1367. Federal question jurisdiction is invoked through Ensign's Carmack Amendment claim brought under 49 U.S.C. § 14706. Respecting supplemental jurisdiction, § 1367(a) states:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal Statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**\*8** Thus, even when no independent basis for federal jurisdiction exists, a district court may exercise subject matter jurisdiction over state law claims when those claims are part of the same "case or controversy" that includes a federal claim. The Second Circuit has held that "disputes are part

of the same case or controversy within § 1367 when they derive from a common nucleus of operative fact." *Achtman v. Kirby McInerney & Squire, LLP,* 464 F.3d 328, 335 (2d Cir.2006) (internal quotation marks omitted). To determine whether claims arise from a "common nucleus of operative fact," the appropriate inquiry is whether "the facts underlying the federal and state claims substantially overlapped ... [or] the federal claim necessarily brought the facts underlying the state claim before the court." *Id.* "This is so even if the state law claim is asserted against a party different from the one named in the federal claim." *Id.*

Here, it is clear that Ensign's claims against Saperstein, and all of its state law claims for that matter, arise from the same nucleus of operative fact as the Carmack claim against Arrigoni. The Carmack claim involves the interstate transport of Ensign's Yacht and the damage to the Yacht that resulted during that transport. Each of Ensign's state law claims directly relate to the transport of or damage to the Yacht in that they allege either wrongs related to the procurement of insurance for transport of the Yacht, or defects in the claims handling process after the Yacht was damaged.

A court has subject matter jurisdiction over state law claims arising from the same nucleus of operative fact as the plaintiff's federal claim unless that jurisdiction is limited by 28 U.S.C. § 1367(b). Section 1367(b) provides that "where district courts have original jurisdiction founded solely on [diversity jurisdiction under] section 1332 of this title, the district courts shall not have supplemental jurisdiction ... over claims by plaintiffs ... when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332." Saperstein argues that § 1367(b) deprives this Court of jurisdiction over Ensign's state law claims against it.

Contrary to Saperstein's argument, § 1367(b) is clearly inapplicable in this case. By its terms, § 1367(b) limits a district court's exercise of supplemental jurisdiction only in cases that invoke nothing but diversity jurisdiction. The present case invokes the Court's federal question jurisdiction. *See* 13B Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 3567.2 ("Thus, § 1367(b) does not apply in cases that invoke federal jurisdiction on any non-diversity basis, such as federal question jurisdiction. In a case invoking a non-diversity basis of jurisdiction, if supplemental jurisdiction is granted by § 1367(a), there is no § 1367(b) analysis whatever."); *see also Rotter v. Leahy,* 93 F.Supp.2d 487, 497 n. 3 (S.D.N.Y.2000) ("Section

1367(b) does not apply in this case, since jurisdiction is not predicated solely on diversity, but also on federal question (§ 1331) jurisdiction."); *Estate of Bruce v. City of Middletown,* 781 F.Supp. 1013, 1017 n. 2 (S.D.N.Y.1992) ("Since federal question jurisdiction in this case does not rest upon diversity but a federal claim under § 1983, the exceptions to supplemental jurisdiction incorporated within § 1367(b) do not apply ."). Accordingly, because Ensign invokes the Court's federal question and concomitant supplemental jurisdiction under the Carmack Amendment, a federal statute, § 1367(b) is irrelevant and Saperstein's argument for dismissal on the basis of § 1367(b) is meritless.

### D. *Breach of Contract*

**\*9** Ensign asserts breach of contract claims against Lloyds and Saperstein. The purported factual basis for these claims is that Ensign and/or its predecessor Cigarette requested that Arrigoni obtain insurance to cover transport of the Yacht to be issued in the name of Ensign and/or Cigarette. According to Ensign, Arrigoni acquired, through Saperstein, a Certificate of Liability Insurance (the "Certificate") which named Cigarette as the Certificate holder. Lloyds allegedly issued Policy Nos. R704230/112 and R704390/0010 in favor of Cigarette to insure against any losses during the loading, transit, and discharge of the Yacht. *See* Am. Compl. ¶¶ 18–20.

Although the parties do not make a choice-of-law argument, Ensign relies upon New York law in its opposition to support its breach of contract claims, while Lloyds and Saperstein cite Connecticut law in their motions to dismiss. Therefore, the Court will briefly address choice-of-law principles. In a federal question action where a district court's subject matter jurisdiction over non-federal claims is based on supplemental jurisdiction, the district court applies the choice-of-law rules of the forum state, which is Connecticut in this case. *See Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989). The Connecticut Supreme Court has adopted the approach for analyzing choice-of-law issues enunciated in the *Restatement (Second) of Conflict of Law,* § 188, pursuant to which the law of the state that has the "most significant relationship" to the transaction and parties at issue is applied in contract cases. *See Reichold Chemicals, Inc. v. Hartford Accident & Indemnity Co.,* 243 Conn. 401, 413–14 (2000). Based upon the allegations in the Amended Complaint, it is clear that Connecticut has the most significant relationship to the transaction and parties at issue in this case. Arrigoni's place of business is located in Connecticut, and he negotiated

insurance coverage for transport of the Yacht with Saperstein, which is incorporated in New York but also transacts business in Connecticut. Ensign is incorporated in New York as well, but its offices are located in Connecticut. Thus, the insurance contract at issue was negotiated in Connecticut by a Connecticut resident, and covered the interstate transport of the Yacht by a Connecticut resident for a business whose offices are located in Connecticut. Accordingly, choice-of-law principles dictate that this Court apply Connecticut law to Ensign's claims.

Under Connecticut law, "[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Rosato v. Mascardo,* 82 Conn.App. 396, 411 (2004) (citations and quotation marks omitted). Lloyds and Saperstein argue that Ensign cannot satisfy any of these elements because it had no contract with them. In making this argument, they rely upon the Certificate, attached to Ensign's original complaint as Exhibit 1, which expressly provides:

> **\*10** THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.[4]

Only Arrigoni is listed as an insured on the Certificate. Based upon this fact in conjunction with the above-quoted language, it is clear that the Certificate itself does not constitute a contract between Ensign and Lloyds/Saperstein.

However, Ensign argues in response that it was a third party beneficiary of the insurance agreement between Arrigoni and Lloyds/Saperstein. "A third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract. Therefore, a third party beneficiary who is not a named obligee in a given contract may sue the obligor for breach." *Gateway Co. v. DiNoia,* 232 Conn. 223, 230–31 (1995) (internal citation omitted). Thus, the essential question in this case is whether Ensign was a third party beneficiary.

The Connecticut Supreme Court has explained that "the ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the [mutual] intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] and ... that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making ..." *Pelletier v. Sordoni/Skanska Construction Co.,* 264 Conn. 509, 531 (2003) (quoting *Grigerik v. Sharpe,* 247 Conn. 293, 311–12 (1998)). "Although it is not in all instances necessary that there be express language in the contract creating a direct obligation to the claimed third party beneficiary ... the only way a contract could create a direct obligation between a promisor and a third party beneficiary would have to be ... because the parties to the contract so intended." *Gazo v. City of Stamford,* 255 Conn. 245, 261 (2001). "The mere fact that a contract of liability insurance exists between the tortfeasor and insurance company does not somehow make the injured party a third-party beneficiary to the contract." *Alexander v. W.F. Shuck Petroleum Co.,* No. HHBCV085010050, 2009 WL 2783587, at \*4 (Conn.Super.Ct. Aug. 3, 2009).

The Court finds that Ensign has sufficiently pleaded a third party beneficiary cause of action for breach of contract against Lloyds and Saperstein. Ensign alleges that Arrigoni acquired, through Saperstein, two insurance policies issued by Lloyds to cover the risk of loss during transport of the Yacht. Although Ensign was not named as an insured on the Certificate, Ensign claims that it was an intended beneficiary of the policies. Lloyds and Saperstein argue that Ensign's claim is contradicted by the Certificate, which expressly states that it confers no rights upon Cigarette as the Certificate holder. However, this is not dispositive at the motion to dismiss stage, because the test for determining whether Ensign is a third party beneficiary of the agreement between Arrigoni and Lloyds/Saperstein requires the Court to discern the intent of these parties based upon the terms of the insurance policies themselves read in light of the circumstances attending their making. *See Pelletier,* 264 Conn. at 531. Since the policies have not been attached to the pleadings, the Court has not yet had the opportunity to review the policies and determine, based upon their terms read in the light of the circumstances attending their making, whether Arrigoni and Lloyds/Saperstein intended that Lloyds/Saperstein would assume a direct obligation to Ensign. *See Rapaport and Benedict, P.C. v. City of Stamford,* 39 Conn.App. 492, 498 (1995) (observing that "ordinarily the question of contractual intent presents a question of fact for

the ultimate fact finder"). Accordingly, dismissal of Ensign's breach of contract claims at this stage would be premature.

**\*11** Saperstein makes the additional argument that, under the law of agency, it cannot be held liable for the contracts of a disclosed principal, namely Lloyds. Under Connecticut law, an "agent is not liable where, acting within the scope of his authority, he contracts with a third party for a known principal." *Schribner v. O'Brien, Inc.,* 169 Conn. 389, 405 (1975); *see also Behlman v. Universal Travel Agency, Inc.,* 4 Conn.App. 688, 690 (1985) ("An agent, by making a contract only on behalf of a competent disclosed principal whom he has the power to bind, does not thereby become liable for its nonperformance.") (citing *Restatement (Second) Agency,* § 328). "To avoid personal liability, it is the duty of the agent to disclose both the fact that he is acting in a representative capacity and the identity of his principal." *Behlman,* 4 Conn.App. at 690. While it appears from the pleadings that Saperstein acted at least in part on behalf of Lloyds, Ensign also alleges that Saperstein was acting as a broker for the purpose of insuring Ensign and that Saperstein itself made misrepresentations related to insurance coverage for transport of the Yacht. *See Restatement (Second) Agency,* § 388 comment b (noting that, if an agent misrepresents "circumstances affecting the probability of performance [of a contract], the failure of the principal to perform may subject [the agent] to liability for damages so caused"). Therefore, the Court will not dismiss Ensign's breach of contract claim against Saperstein on the basis of agency law.

### E. *Breach of the Covenant of Good Faith and Fair Dealing*

Ensign alleges that Lloyds and Saperstein breached the covenant of good faith and fair dealing by refusing to timely and properly adjust or process Ensign's claim for damages sustained to its Yacht.

The requirements for pleading a breach of the covenant of good faith and fair dealing under Connecticut law are well-established. "[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement ... The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term ... To constitute a breach of [the implied covenant of good faith and fair

dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Renaissance Management Co., Inc. v. Connecticut Housing Finance Authority,* 281 Conn. 227, 240 (2007). "[T]he existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing." *Macomber v. Travelers Property and Casualty Corp.,* 261 Conn. 620, 638 (2002).

**\*12** As the Connecticut Supreme Court has explained, "[g]ood faith and fair dealing means an attitude or state of mind denoting honesty of purpose, freedom from intention to defraud and generally speaking means faithful[ness] to one's duty or obligation ... [B]ad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties ... [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity[;] ... it contemplates a state of mind affirmatively operating with furtive design or ill will." *Buckman v. People Express, Inc.,* 205 Conn. 166, 171 (1987).

Lloyds and Saperstein first argue that Ensign's claims for breach of the covenant of good faith and fair dealing must be dismissed because they had no contract with Ensign, which is a prerequisite to such a claim. However, as discussed above, Ensign has alleged that it is a third party beneficiary of Arrigoni's insurance policies with Lloyds/Saperstein. If a plaintiff adequately pleads third party beneficiary status under a contract, it may assert a claim for breach of the covenant of good faith and fair dealing. *See, e.g., 701 Main Street, LLC v. RLS Design Build LLC,* No. FBTCV085016969S, 2008 WL 5220689, at \*2 (Conn.Super.Ct. Nov. 20, 2008) ("So long as a plaintiff has adequately alleged third party beneficiary status under the ... contract [the] breach of implied covenant of good faith and fair dealing ... [claim is] legally sufficient.") (citation omitted; internal quotation marks omitted); *DiNuzzo v. Bute,* No. CV020469411S, 2004 WL 2943293, at \*2 (Nov. 15, 2004) ("[C]onstruing the plaintiff to be a third-party beneficiary of the ... insurance contract provides ... the contractual basis for the alleged breach of the covenant of good faith and fair dealing[.]"). [5]

Saperstein further argues that Ensign's Amended Complaint fails to plead facts supporting its claim that Saperstein's actions were taken in bad faith. While Connecticut appellate

courts have not addressed what allegations are required to plead bad faith in cases where an insurer denies coverage under an insurance policy, a majority of Superior Court cases have held that the plaintiff "must plead facts that go beyond a simple breach of contract claim and enter into a realm of tortious conduct which is motivated by a dishonest or sinister purpose." *Agency on Aging for South Central Connecticut v. Executive Risk Specialty Insurance,* No. CV095027399, 2009 WL 5698248, at *4 (Conn.Super.Ct. Dec. 21, 2009). Thus, the plaintiff must plead additional factual allegations beyond the facts supporting a breach of contract claim in order to state a claim for breach of the covenant of good faith and fair dealing. *See id.* at *5.

**\*13** Here, Ensign alleges that Lloyds and Saperstein refused to process Ensign's claim and denied the claim without providing any reason for the denial, which is essentially the basis of Ensign's breach of contract claims. However, Ensign further alleges that Lloyds and Saperstein were not properly licensed to conduct the business of insurance in Connecticut, and that they intentionally concealed this fact from Ensign. These additional allegations amount to more than a mere denial of the claim. If proven true, they may support an inference that Lloyds and Saperstein were motivated by a dishonest purpose to conceal the fact that they were issuing insurance policies in Connecticut without obtaining the proper licenses. *See e.g., Bates v. Utica Mutual Insurance Co.,* No. CV020088925S, 2003 WL 21327656, at *2 (Conn.Super.Ct. May 29, 2003) (denying motion to strike breach of the covenant of good faith and fair dealing claim where plaintiff alleged that insurance company refused to issue voluntary agreements and failed to make payments after acknowledging in writing that plaintiff's claims were compensable and agreeing at a hearing to make the payments). Therefore, the Court will not dismiss Ensign's claims against Lloyds and Saperstein for breach of the covenant of good faith and fair dealing.

### F. *Bad Faith*

Ensign also asserts bad faith claims against Lloyds and Saperstein. In support of these claims, Ensign alleges that Lloyds and Saperstein intentionally concealed from Ensign that they were not duly authorized to conduct the business of insurance in Connecticut and that they would not honor claims presented under the insurance policies obtained by Arrigoni to cover transport of the Yacht.

As an initial matter, the Court notes that Ensign's bad faith claims are similar, but distinct from, its claims alleging breach of the covenant of good faith and fair dealing. *See Michalek v. Allstate Ins. Co.,* No. CV075008280, 2008 WL 283945, at *4 (Conn.Super.Ct. Jan. 18, 2008). As discussed above, bad faith "is a necessary, but insufficient condition for a breach of the covenant of good faith and fair dealing." *Id.* Bad faith is also separately recognized as a tort claim in Connecticut. *See Bergen v. Standard Fire Ins. Co.,* No. CV 93044099S, 1997 WL 809957, at *15 (Conn.Super.Ct. Dec. 31, 1997).

Where, as here, the plaintiff alleges unreasonable withholding of payment on an insurance policy, in order to prove bad faith the plaintiff must show "a reckless indifference to the rights of the insured[;] egregious conduct is required." *Id.* "[A] finding of bad faith cannot be based on a simple breach of contract." *Id* . Instead, the plaintiff "must show that there is no reasonable basis to have denied the claim and that the insurer knew this to be the case[.]" *Id.* The reason for this requirement is that insurers "have the right to fairly dispute a claim made under the policy." *Id.*

Here, Ensign alleges that Lloyds and Saperstein refused to process Ensign's claim and denied the claim without providing any reason for the denial. Ensign further alleges that Lloyds and Saperstein were not licensed insurance companies in Connecticut, and that they intentionally concealed this fact from Ensign. If proven, these allegations may support an inference that Lloyds and Saperstein denied Ensign's claim because they were not authorized to conduct the business of insurance in Connecticut, and not because they had a reasonable basis for denying Ensign's claim under the policies. While Lloyds and Saperstein may well have had a reasonable basis for denying Ensign's claim, the pleadings do not contain any facts elucidating the reason for the denial, and therefore Ensign's bad faith claims must survive the motions to dismiss.

### G. *Fraud*

**\*14** Ensign next asserts fraud claims against Lloyds and Saperstein, alleging that these Defendants fraudulently concealed from Ensign that they were not properly licensed to conduct the business of insurance in Connecticut and that they would not honor insurance claims presented to them. Lloyds and Saperstein move to dismiss these claims on the basis that Ensign has failed to plead fraud with particularity as required by Fed.R.Civ.P. 9.

The elements of a cause of action for fraud are: "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the party relied on the statement to his detriment." *Muller v. Muller,* 43 Conn.App. 327, 337–38 (1996). "Usually, mere nondisclosure does not amount to fraud ... Nondisclosure may, however, amount to fraud when there is a failure to disclose known facts under circumstances that impose a duty to speak ..." *Dockter v. Slowik,* 91 Conn.App. 448, 458 (2005).

Pursuant to Fed.R.Civ.P. 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "To satisfy this requirement, a plaintiff should specify the time, place, speaker, and content of the alleged misrepresentations. In addition, the complaint should explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Caputo v. Pfizer, Inc.,* 267 F.3d 181, 191 (2d Cir.2001) (citations omitted).

The Court concludes that Ensign has failed to plead fraud with the particularity required by Fed.R.Civ.P. 9(b). Ensign merely alleges in conclusory fashion that Lloyds and Saperstein fraudulently concealed from Ensign the fact that they were not properly licensed to conduct the business of insurance in Connecticut and that they would not honor insurance claims presented to them. The Amended Complaint fails to specify the time, place, speaker and content of any alleged misrepresentations made by Lloyds or Saperstein, and neglects to explain how the alleged misrepresentations were fraudulent. Nor does the Amended Complaint allege a single specific instance in which Lloyds or Saperstein had a duty to disclose any information to Ensign, but failed to do so. Ensign's opposition to the motions to dismiss is similarly devoid of any explanation as to how it has satisfied the requirements of Fed.R.Civ.P. 9(b). Consequently, Ensign's fraud claims against Lloyds and Saperstein are dismissed. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 187 (2d Cir.2004) (dismissing fraud claim because plaintiff's complaint lacked "particularized facts to support the inference that the defendants acted recklessly or with fraudulent intent," and explaining that "conclusory allegations do not satisfy Rule 9(b)").

## H. *CUIPA and CUTPA*

**\*15** Ensign also asserts claims against Lloyds and Saperstein for breach of CUIPA and CUTPA. With respect to the CUIPA claims, Lloyds and Saperstein correctly argue that CUIPA does not provide a private right of action. *See Lander v. Hartford Life & Ann. Ins. Co.,* 251 F.3d 101, 118 (2d Cir.2001) ( "Although not yet conclusively decided by the Connecticut Supreme Court, most federal and Connecticut state courts have determined that [CUIPA] does not provide a private right of action."). However, the Connecticut Supreme Court has recognized "the existence of a private cause of action under CUTPA to enforce alleged CUIPA violations," a so-called "CUIPA through CUTPA" claim. *See Mead v. Burns,* 199 Conn. 651, 662–63 (1986).

Ensign alleges that Lloyds and Saperstein violated two sections of CUIPA. First, Ensign claims that Lloyds and Saperstein violated Conn. Gen.Stat. § 38a–816(1), which prohibits "misrepresentations and false advertising of insurance policies." In order to succeed on a "CUIPA through CUTPA" claim under this section, "the plaintiff must allege and prove the four established elements of a negligent misrepresentation claim: (1) the defendant made a misrepresentation of fact; (2) which the defendant knew or should have known was untrue; (3) the plaintiff reasonably relied on the misrepresentation; and (4) the plaintiff suffered pecuniary harm as a result of the misrepresentation." *See Active Ventilation Products, Inc. v. Property & Casualty Ins. Co. of Hartford,* No. X09CV085023757, 2009 WL 2506360, at *2 (Conn.Super.Ct. July 15, 2009).

Second, Ensign claims that Lloyds and Saperstein violated Conn. Gen.Stat. § 38a–816(6), which prohibits "unfair claim settlement practices" that are performed "with such frequency as to indicate a general business practice [.]" In order to establish a "CUIPA through CUTPA" claim under this section, the plaintiff must show "more than a single act of insurance misconduct." *Mead,* 199 Conn. at 659. "[A] CUTPA claim based on an alleged unfair claim settlement practice prohibited by § 38a–816(6) require[s] proof, as under CUIPA, that the unfair settlement practice ha[s] been committed or performed by the defendant with such frequency as to indicate a general business practice." *Lees v. Middlesex Ins. Co .,* 229 Conn. 842, 850 (1994) (internal quotation marks omitted). "In requiring proof that the insurer has engaged in unfair claim settlement practices 'with such frequency as to indicate a general business

practice,' the legislature has manifested a clear intent to exempt from coverage under CUIPA isolated instances of insurer misconduct." *Id.* at 849.

Lloyds argues that a "CUIPA through CUTPA" claim cannot be brought by "third parties" to an insurance contract such as Ensign. However, Ensign alleges that it is a third party *beneficiary* to the insurance agreement between Arrigoni and Lloyds/Saperstein, not merely a third party claimant. As discussed above, "[a] third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract." *Gateway,* 232 Conn. at 230–31. This is because both parties to the contract intended that the promisor "would assume a direct obligation to the third party [beneficiary]." *Pelletier,* 264 Conn. At 531. In addition, the promisor owes a duty of good faith and fair dealing to a third party beneficiary. *See DiNuzzo,* 2004 WL 2943293, at *2. Where, as here, it is plausibly alleged that the plaintiff is a third party beneficiary to an insurance contract and thus that the insurer has assumed a direct obligation to the plaintiff, the Court believes that the plaintiff should be able to assert a CUIPA through CUTPA claim against the insurer for unfair settlement practices. *See, e.g., Cirrito v. Crawford & Co.,* No. CV010456052S, 2002 WL 31939119, at *6–*7 (Conn.Super.Ct. Dec. 24, 2002) (denying motion to strike CUIPA through CUTPA claim brought by third-party beneficiary to insurance contract). The Connecticut Appellate Court case cited by Lloyds, *Carford v. Empire Fire and Marine Ins. Co.,* 94 Conn.App. 41 (2005), is inapposite because the plaintiff in that case was not a third party beneficiary of the insurance contract at issue. *See id.* at 52 (holding that plaintiff injured in an automobile accident could not assert CUIPA through CUTPA claim against insurer of other driver absent subrogation or a judicial determination in plaintiff's favor against the insured).

\*16 Saperstein presents three additional reasons why Ensign's CUIPA and CUTPA claims should be dismissed: first, the claims simply assert "professional negligence;" second, Ensign fails to plead facts sufficient to demonstrate corrupt, immoral and/or unscrupulous behavior on the part of Saperstein; and third, Ensign has not pleaded that the unfair claim settlement practices alleged rise to the level of a general business practice.

The Court is unpersuaded by Saperstein's first two arguments. Ensign alleges that Lloyds and Saperstein engaged in misrepresentation under Conn. Gen.Stat. § 38a–816(1) by "misrepresenting the benefits, advantages, conditions and

terms of the policy." Ensign further alleges that Lloyds and Saperstein conducted unfair settlement practices in violation of Conn. Gen.Stat. § 38a–816(6) by, *inter alia,* "misrepresenting coverage provisions in the policy;" "failing to acknowledge and act with reasonable promptness upon [Ensign's] claims under the policy and failing to pay [Ensign's] claim promptly;" "failing to adopt and implement reasonable standards for the prompt investigation of" Ensign's claim; "refusing to pay [Ensign's] claim promptly;" "failing to affirm or deny coverage of [Ensign's] claim within a reasonable time after proof of loss" was provided; "failing to effectuate a prompt, fair and equitable settlement of [Ensign's] claim in good faith;" "forcing [Ensign] to institute litigation to recover amounts due under the policy by failing to offer compensation;" "misrepresenting that they were authorized to issue insurance policies to entities in Connecticut and/or in any jurisdiction;" and "instructing defendant Arrigoni not to cooperate and/or assist in the submission and adjustment of [Ensign's] claim." Am. Compl. ¶¶ 92, 102. The factual allegations in the Amended Complaint suggest that Lloyds and Saperstein falsely represented to Ensign that it was sufficiently insured for the risk of damage to the Yacht during transport by Arrigoni, and that these Defendants subsequently stonewalled Ensign when it submitted its claim by refusing to deal with the public adjuster it had retained and denying its claim without providing any reason for the denial. If proven true, these allegations would rise beyond the level of "professional negligence," and could in fact constitute a violation of CUIPA. [6]

With respect to Saperstein's third argument, the Court notes as an initial matter that this argument applies only to Ensign's claims for unfair settlement practices under Conn. Gen.Stat. § 38a–816(6), which require proof that the unfair settlement practices alleged were committed with "such frequency as to indicate an a general business practice." Conn. Gen.Stat. § 38a–816(6); *see also Lees,* 229 Conn. at 850. This argument does not apply to Ensign's claims for misrepresentation of insurance policies under Conn. Gen.Stat. § 38a–816(1), which do not require a showing that the misrepresentations alleged rose to the level of a general business practice.

\*17 Ensign has alleged that the above-described unfair claim settlement practices were committed by Lloyds and Saperstein as part of their general business practice in that they sold similar or identical insurance policies to other Connecticut residents with the intention of avoiding coverage on similar grounds. *See* Am. Compl. ¶¶ 93, 103. However, the Amended Complaint asserts facts relating only to Ensign's

insurance claim against Lloyds and Saperstein, and does not identify any other specific instances in which these Defendants purportedly engaged in violations of CUIPA or any other claimants who suffered from similar unfair claim settlement practices.

The Court recognizes that there is a split among Connecticut Superior Courts on the issue of whether an allegation that a complained-of practice constitutes an insurer's "general business practice," without specific examples of other instances in which the insurer has engaged in the same practice, is sufficient to state a cause of action for violation of § 38a–816(6). *See Active Ventilation,* 2009 WL 2506360, at *3–*4. Given the remedial nature of CUTPA and CUIPA, the Court would be inclined to agree with those courts which have held that the allegation of a general business practice, unsupported by specific instances of insurer misconduct in other cases, is sufficient to withstand a motion to dismiss. However, the applicable pleading standard for this forum requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* Thus, under the *Iqbal* pleading standard, a mere assertion of a general business practice without anything more is insufficient to sustain Ensign's "CUIPA through CUTPA" claims against Lloyds and Saperstein for violation of Conn. Gen.Stat. § 38a–816(6). Accordingly, the Court dismisses these claims. Ensign's "CUIPA through CUTPA" claims against Lloyds and Saperstein for misrepresentation under Conn. Gen.Stat. § 38a–816(1) shall go forward, as Ensign has pleaded facts sufficient to state a cause of action for negligent misrepresentation.[7] *See Active Ventilation,* 2009 WL 2506360, at *2 (explaining that a plaintiff must plead and prove the elements of a negligent misrepresentation claim to succeed on a cause of action under § 38a–816(1)).

### I. *Tortious Interference with Contract*

Ensign next asserts a claim for tortious interference with contract against Saperstein. In support of this claim, Ensign alleges that Saperstein interfered with Ensign's agreement with Arrigoni by instructing Arrigoni not to cooperate with Ensign until Ensign paid Arrigoni the remaining money due for transport of the Yacht. "A claim for

intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with that relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff which was caused by the defendant's tortious conduct."

**\*18** The Court concludes that Ensign has stated a cause of action for tortious interference with contract. Ensign alleges that it had a contract with Arrigoni requiring Arrigoni to obtain proper insurance and thereafter, if necessary, to assist in submitting any insurance claims that may arise. Ensign further claims that Saperstein advised Arrigoni not to cooperate with the submission of Ensign's claim for damages to the Yacht until Ensign paid Arrigoni in full for the Yacht's transport. Ensign alleges that, as a result of Saperstein's interference, Ensign sustained damages in the amount of $700,000.

Saperstein contends that this claim must be dismissed because Ensign fails to explain how Saperstein's conduct was tortious. However, Ensign's Amended Complaint describes a course of conduct by Saperstein to conceal from Ensign that it was not properly licensed to issue insurance policies in Connecticut and to deny Ensign's claim without justification. Saperstein's instruction to Arrigoni advising him not to cooperate with Ensign was allegedly part of this course of conduct. If proven true, these facts could support the "improper motive or means" necessary to establish the sufficiency of Ensign's tortious interference with contract claim against Saperstein. *See Holler v. Buckley Broadcasting Corp.,* 47 Conn.App. 764, 769 (1998); *Blake v. Levy,* 191 Conn. 257, 262 (1983). Consequently, the Court will not dismiss this claim.

### J. *Loss of Sale*

Finally, Lloyds and Saperstein move to dismiss Ensign's claims for "loss of sale" on the basis that loss of sale is an element of damages, not a separate cause of action. Ensign offers no response to this argument. Since Ensign has cited no Connecticut cases recognizing a separate cause of action for loss of sale, and has not objected to dismissal of its loss of sale claims, these claims are dismissed.

### III. *CONCLUSION*

Based on the above reasoning, Arrigoni's motion to dismiss is GRANTED. All of Ensign's claims against Arrigoni other than the Second Cause of Action for violation of the Carmack Amendment are dismissed (First, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action). Lloyds' and Saperstein's motions to dismiss are GRANTED IN PART and DENIED IN PART. Ensign's fraud and loss of sale claims against Lloyds and Saperstein are dismissed in their entirety (Eleventh, Fifteenth, Eighteenth, [8] and Twenty–Second Causes of Action). Ensign's CUIPA and CUTPA claims against Lloyds and Saperstein are dismissed only insofar as they are predicated upon violation of Conn. Gen.Stat. § 38a–816(6), and shall go forward to the extent they are based upon violation of Conn. Gen.Stat. § 38a–816(1) (Twelfth, Fourteenth, Twentieth, and Twenty–First Causes of Action). Ensign's breach of contract, breach of the covenant of good faith and fair dealing, bad faith, and tortious interference claims against Lloyds and Saperstein shall go forward as well (Eighth, Ninth, Tenth, Thirteenth, Sixteenth, Seventeenth, and Eighteenth Causes of Action).

**\*19** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 918107

Footnotes

1   The Carmack Amendment provides, in relevant part: "A common carrier ... subject to the jurisdiction of the Interstate Commerce Commission ... shall issue a receipt or a bill of lading for property it receives for transportation ... That carrier ... and any other common carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission ... are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (1) the receiving carrier, (2) the delivering carrier, or (3) another carrier over whose line or route the property is transported in the United States." 49 U.S.C. § 14706(a)(1). A "carrier" under the Carmack Amendment specifically includes a "motor carrier," which is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(3) and (14).

2   Ensign also suggests that dismissal of these claims is inappropriate because Arrigoni has not provided proof that he is a carrier within the meaning of the Carmack Amendment. However, Ensign expressly admits that Arrigoni is a carrier, alleging in its Amended Complaint that "Arrigoni was at all material times engaged in the business of a motor carrier and was a receiving, delivering, transporting, and/or other carrier within the meaning of the Carmack Amendment." Am. Compl. ¶ 51. Indeed, Ensign expressly rests its assertion of this Court's subject matter jurisdiction on Arrigoni's status as a carrier under the Carmack Amendment. Id. ¶ 1. Ensign cannot defeat Arrigoni's motion to dismiss by contradicting express allegations made in its Amended Complaint.

3   Saperstein does not assert a Carmack preemption defense. Nevertheless, the Court notes that the foregoing analysis applies equally to Saperstein.

4   The Court may properly consider exhibits attached to a complaint in deciding a motion to dismiss. See Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir.1993).

5   Lloyds also argues that Ensign's claim that Lloyds was not properly licensed in Connecticut is patently untrue, because, at all times relevant to this case, Lloyds was duly listed as an insurer in the records of Connecticut's Insurance Department. See Lloyds' Motion to Dismiss, Ex. A. However, the records attached by Lloyds are effective as of January 13, 2009. Lloyds does not attach records demonstrating that it was licensed in Connecticut during the time of the events giving rise to this action. Since the Court must accept the allegations in Ensign's Amended Complaint as true for purposes of a motion to dismiss, the Court cannot dismiss Ensign's claims on this basis.

6   Conn. Gen.Stat. § 38a–816(1) prohibits "misrepresentations and false advertising of insurance policies," including, inter alia, misrepresentations regarding "the benefits, advantages, conditions or terms of any insurance policy[.]" Conn. Gen.Stat. § 38a–816(6) prohibits "unfair claim settlement practices," including, inter alia, "misrepresenting pertinent facts or insurance policy provisions relating to coverages at issues;" "failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies;" "failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;" "refusing to pay claims without conducting a reasonable investigation based upon all available information;" "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;" and "compelling insureds to institute litigation to recover amounts due under an insurance policy."

**7**    The Court notes that the heightened pleading standard set forth in Fed.R.Civ.P. 9(b) does not apply to claims for negligent misrepresentation under Connecticut law. *See DeNuzzo v. Yale New Haven Hospital,* 465 F.Supp.2d 148, 154 n. 2 (D.Conn.2006); *IM Partners v. Debit Direct Ltd.,* 394 F.Supp.2d 503, 521 n. 12 (D.Conn.2005).

**8**    Ensign's Amended Complaint contains two claims against Lloyds designated as the "Eighteenth Cause of Action." To be clear, the Court is dismissing the fraud claim asserted in ¶¶ 123–125. The bad faith claim asserted in ¶¶ 113–116 shall go forward.

---

**End of Document**                                            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2311837
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

PLEASURE ISLAND, INC., et al., Plaintiffs,

v.

CITY OF NEW YORK, et al., Defendants.

No. 12 Civ. 4699(ILG)(SMG).
|
May 24, 2013.

**Attorneys and Law Firms**

Linda Cronin, Susan P. Bernstein, Cronin & Byczek
LLP, New Hyde Park, NY, Rocco G. Avallone, Shahin
Mashhadian, Cronin & Byczek, LLP, Lake Success, NY, for
Plaintiffs.

Nicholas R. Ciappetta, Teresita V. Magsino, New York City
Law Department, Eva Lenore Dietz, Office of NYS Attorney
General, New York, NY, for Defendants.

MEMORANDUM AND ORDER

GLASSER, Senior District Judge.

**\*1** Plaintiffs Pleasure Island, Inc. d/b/a Galaxy Restaurant
("Pleasure Island"), Marat Zagorin ("Zagorin"), and Mark
Shteynshlyuger ("Shteynshlyuger," collectively "plaintiffs")
bring this action against the City of New York ("City"),
Community Board # 15 ("CB15") and its members (together
with the City, "city defendants"), New York State Liquor
Authority ("SLA"), four current and former SLA officials
("SLA officials"), and two state legislators (together with
the SLA officials, "individual state defendants," and with the
SLA, "state defendants"), alleging that their application for
a liquor license was denied based upon religion and national
origin in violation of federal, state, and city law. Plaintiffs also
bring claims for defamation and tortious interference with
contracts under state law.

Currently before the Court are state defendants' motion to
dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal
Rules of Civil Procedure, and city defendants' motion to
dismiss pursuant to Rule 12(b)(6). For the reasons set forth
below, defendants' motions are hereby GRANTED.

BACKGROUND

**I. Facts**
The following facts are taken from plaintiffs' Complaint,
documents referenced in the Complaint, and public records.
They are accepted as true for purposes of this motion, except
to the extent they are contradictory.

From about 2005 through 2008, Zagorin was one-third owner
of T E M Bar Lounge Corp. ("T E M") located at 816 Avenue
U in Brooklyn, New York. Complaint dated September 12,
2013 ("Compl.") ¶ 24 (Dkt. No. 1).[1] T E M held an on-
premises liquor license and was cited for multiple violations.
Compl. ¶¶ 26–28; Affirmation of Mark D. Frering dated
Jan. 3, 2013 ("Frering Aff."), Ex. A at 1–2.[2] From 2008
through 2010, a Japanese restaurant unaffiliated with Zagorin
operated in this location. Compl. ¶ 54.

In January 2011, plaintiffs began construction on 816 Avenue
U in order to open a new establishment: Pleasure Island. Id. ¶
20. Plaintiffs characterize Pleasure Island as an "upscale full
service restaurant geared towards young professionals with
recorded music and, on occasion, light live entertainment."
Id. ¶ 37. Shteynshlyuger owned 90% of Pleasure Island,
Zagorin owned 10%, and together they spent about $425,000
in construction costs and $190,000 in expenses. Id. ¶¶ 22–23.
Both Shteynshlyuger and Zagorin are Russian and Jewish. Id.
¶¶ 8–9.

Before starting construction, plaintiffs applied for an on-
premises liquor license for Pleasure Island. Id. ¶¶ 19, 37.
Plaintiffs' liquor license application characterizes Pleasure
Island as a "Bar / Lounge," and in the "Extent of Food
Service" section selects the "tavern" option for "alcohol sales
primarily," and not the "restaurant" or "tavernrestaurant"
option. Declaration of Teresita V. Magsino dated Dec. 28,
2012 ("Magsino Decl."), Ex. A (Dkt. No. 36–2). Plaintiffs
allege that they were assured by unspecified individuals
that their application for a liquor license would be "walked
through." Compl. ¶ 39.

**\*2** SLA is the state agency responsible for liquor license
applications. Id. ¶ 11. Ordinarily, SLA will approve an
application for an on-premises liquor license unless there is
good cause for denial. Id. ¶ 38. However, when an applicant
for an on-premises liquor license is located within a 500
foot radius of three or more existing establishments with on-

premises liquor licenses, the burden shifts and SLA will deny the license unless it finds that granting the license is in the public interest ("500 Foot Law"). Frering Aff., Ex. A at 2. As part of that determination, SLA must consult with the local Community Board and hold a hearing ("500 Foot Hearing"). *Id.* Plaintiffs acknowledge that 816 Avenue U is subject to the 500 Foot Law and falls within the jurisdiction of CB15, which prepares nonbinding recommendations of approval or disapproval of liquor license applications. *Id.* at 2–6.

On August 30, 2010, plaintiffs mailed a copy of their on-premises liquor license application to CB15, which considered it at its October 27, 2010 meeting. Magsino Decl., Exs. A–B. The Complaint and the documents incorporated by reference in the Complaint present starkly opposing accounts of that meeting. According to the meeting minutes, board member Robert Gevertzman objected to approving the liquor license because of prior issues at the same location, which prompted other board members to voice opposition to Pleasure Island. Magsino Decl., Ex. B. Chairperson Theresa Scavo took a vote, and CB15 unanimously voted to send a letter recommending rejection to SLA. *Id.* In contrast, plaintiffs claim that Scavo opposed their liquor license application because she did not want to live near a Russian, unkosher establishment. Compl. ¶¶ 21, 35–36, 44. Prior to the meeting, she allegedly engaged in a public smear campaign against plaintiffs that induced State Senator Martin Golden and Assemblyman Steven Cymbrowitz to write letters in opposition to plaintiffs' liquor license application on official letterhead. *Id* . ¶¶ 31–34, 41, 43. At the meeting, Cymbrowitz's letter was read aloud, and CB15 members claimed that they received 300 phone calls in opposition to Pleasure Island. *Id.* ¶¶ 29, 33, 53. Plaintiffs allege that CB15 made up the 300 phone calls to further their conspiracy to only approve kosher restaurants. *Id.* ¶¶ 29, 53, 60–61. [3]

On April 25, 2011, plaintiffs filed their liquor license application with SI A, and an SI A representative held a 500 Foot Hearing for plaintiffs' liquor license application on May 17, 2011. Frering Aff., Ex. A at 1. Although no one appeared at the hearing to oppose plaintiffs' application, CB15 and members of the public informed the hearing officer of their opposition outside the hearing. *Id.* at 2–3; Compl. ¶¶ 39, 45. The hearing officer accepted two letters in opposition on May 19, 2011, which plaintiffs allege was improper. *Id.*

SLA held a full board meeting to consider plaintiffs' application on October 19, 2011. Compl. ¶ 47. At the meeting, plaintiffs claimed that the opposition to their application

stemmed from false rumors that Pleasure Island was going to be an adult venue. *Id.* They testified that they were opening a restaurant that would operate as a lounge late at night, not an adult venue, and two additional witnesses spoke in support of plaintiffs. *Id.* ¶¶ 48–50. A representative for Assemblyman Cymbrowitz appeared in opposition to plaintiffs' application and emphasized that community opposition, including the 300 phone calls, stemmed from prior problems at the location. *Id.* ¶¶ 33–34; Frering Aff., Ex. A at 4. SI A members noted that Pleasure Island's website used the word "nightclub" and were skeptical that Pleasure Island would be a restaurant; however, they decided to defer ruling on plaintiffs' application because of the rumor allegations. Frering Aff., Ex. A at 4–5.

**\*3** SLA considered plaintiffs' application again at its November 16, 2011 full board meeting. At the meeting, a representative for plaintiffs presented a petition of support from members of the community and offered a number of changes to assuage CB15's concerns, such as changing the name of the establishment to "Galaxy Restaurant," closing by 2:00 A.M. instead of 4:00 A.M., adding noise-absorbing curtains, offering valet parking, and using an age verification system. Compl. ¶¶ 51–52. Plaintiffs informed CB15 of these proposed changes prior to this meeting, but CB15 continued to oppose plaintiffs' liquor license application. *Id.* ¶ 51; Frering Aff., Ex. A at 5. SI A concluded that CB15 unanimously voted against granting the liquor license despite being informed of these proposed changes due to the history of problems at the location, which stopped when the Japanese restaurant operated there. Frering Aff., Ex. A at 5. In light of CB15's and Cymbrowitz's opposition, and the lack of complaints about an establishment not affiliated with Zargorin in the same location, SI A voted that granting plaintiffs' application was not in the public interest. *Id.* at 6– 7. Plaintiffs allege that SI A conspired with CB15 to deny its application because CB15 sent an SI A employee an email thanking her for disapproving plaintiffs' application. Compl. ¶ 42.

## II. Procedural History
Plaintiffs filed this action on September 20, 2012, alleging federal, state, and city discrimination claims and additional state law claims. Dkt. No. 1. On December 28, 2012, city defendants moved to dismiss the Complaint, arguing that CB15 and its members merely acted in an advisory capacity and, therefore, cannot be held liable. Dkt. No. 36–4. Plaintiffs filed their opposition on February 7, 2013, and city defendants filed their reply on March 1, 2013. Dkt. Nos. 44–45.

On January 11, 2013, state defendants moved to dismiss the Complaint, arguing, among other things, that plaintiffs' claims are barred by the Eleventh Amendment. Dkt. No. 41–1. Plaintiffs filed their opposition on March 8, 2013, to which they attached the PAC, and state defendants filed their reply on April 19, 2013. Dkt. Nos. 46 & 50. On March 19, 2013, plaintiffs filed a supplemental opposition to city defendants' motion based on the PAC with Magistrate Judge Gold's permission. Dkt. No. 48–1. City defendants filed their response on April 5, 2013. Dkt. No. 49.

## DISCUSSION

### I. Legal Standards

#### A. Rule 12(b)(1)
"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). To defeat a Rule 12(b) (1) motion to dismiss, plaintiffs "bear[ ] the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005). In resolving such a motion, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff[s]." *Natural Res. Def. Council v. Johnson,* 461 F.3d 164, 171 (2d Cir.2006) (quotation omitted). However, the Court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue." *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004).

#### B. Rule 12(b)(6)
**\*4** Rule 8(a) (2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss pursuant to Rule 12(b) (6), the plaintiff's pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim has facial plausibility "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

Although detailed factual allegations are not necessary, the pleading must include more than an "unadorned, the-defendant-unlawfully-harmed-me accusation;" mere legal conclusions, "a formulaic recitation of the elements of a cause of action," or "naked assertions" by the plaintiff will not suffice. *Id.* (internal quotations and citations omitted). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 556). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

In adjudicating a Rule 12(b)(6) motion, a district court may consider "the complaint and any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily." *Bldg. Indus. Elec. Contractors Ass'n v. City of New York,* 678 F.3d 184, 187 (2d Cir.2012) (quotations omitted).

### II. Federal Claims
Plaintiffs allege that various government agencies and officials conspired to discriminate against them based upon religion and national origin in violation of the First and Fourteenth Amendments, and cite a laundry list of provisions of the Civil Rights Act: 42 U.S.C. §§ 1983, 1985, and 1986. Compl. ¶¶ 64–83.

"Section 1983 governs civil rights actions against a person acting under color of state law who 'subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States.' " *Reyes v. City of New York,* No. 10–cv–1838, 2012 WL 37544, at \*3 (E.D.N.Y. Jan.9, 2012) (quoting 42 U.S.C. § 1983). "The statue itself is not a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred," here, the First and Fourteenth Amendments. *Id.* (quoting *Fowlkes v. Rodriguez,* 584 F.Supp.2d 561, 572 (E.D.N.Y.2008)). "Section 1985 prohibits conspiracy to interfere with civil rights," and " § 1986 creates a cause of action for neglecting to prevent an actionable conspiracy under § 1985." *Sylla*

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

*v. City of New York,* No. 04–cv–5692, 2005 WL 3336460, at \*7 (E.D.N.Y. Dec.8, 2005). Plaintiffs seek $10 million in compensatory damages and an additional $10 million in punitive damages, as well as attorneys' fees and costs, for their federal claims. Compl. ¶¶ 70, 80, 83.

## A. State Defendants

**\*5** Plaintiffs bring claims against SLA, the SLA officials in their individual and official capacities, and two state legislators in their individual and official capacities. *Id.* ¶¶ 11–17. Official-capacity suits are fundamentally directed at the government entity of which the officer is an agent, while "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citations omitted). Whereas "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity," "an official in a personal-capacity action may ... be able to assert personal immunity defenses." *Id.* at 166–67.

The Eleventh Amendment provides sovereign immunity from suits for money damages to state agencies and state officials acting in their official capacities, including state legislators. *Id.* at 169; *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Rini v. Zwirn,* 886 F.Supp. 270, 295 (E.D.N.Y.1995). Therefore, state defendants' motion to dismiss under Rule 12(b)(1) is granted with respect to SLA and the individual state defendants in their official capacities. *Tessler v. Paterson,* 768 F.Supp.2d 661, 672 (S.D.N.Y.2011).[4]

Senator Golden and Assemblyman Cymbrowitz are absolutely immune from personal liability. State legislators are entitled to absolute immunity from personal-capacity suits "for a wide array of legislative acts within 'the sphere of legitimate legislative activity.' " *Favors v. Cuomo,* 285 F.R.D. 187, 208 (E.D.N.Y.2012) (quoting *Bogan v. Scott–Harris,* 523 U.S. 44, 46, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998)). Taking an opposing position during a public meeting is "integral to the legislative process," and, therefore, is entitled to legislative immunity. *Avila v. Estate of Kroogman,* No. 3–02CV851, 2006 WL 214032, at \*3 (D.Conn. Jan.27, 2006) (citing *Bogan,* 523 U.S. at 55). Accordingly, state defendants' motion to dismiss under Rule 12(b)(6) is granted with respect to both state legislators.

State defendants' motion to dismiss under Rule 12(b)(6) is also granted with respect to the SLA officials because plaintiffs fail to allege a single instance of discriminatory conduct by the SLA officials. In sum, the Court dismisses all federal claims against state defendants with prejudice.

## B. City Defendants

Plaintiffs bring claims against CB15, all members of CB15 in their individual and official capacities, and the City. Compl. ¶¶ 10, 18.

### i. Claims against CB15 and its Members

"To state a claim under § 1983, a plaintiff must establish that the defendant deprived him of a federal or constitutional right while acting under the color of state law." *Sazon Inc. v. City of New York,* No. 11 Civ. 3666, 2011 WL 5910171, at \*3 (S.D.N.Y. Nov.28, 2011) (citing *Cox v. Warwick Valley Cent. Sch. Dist.,* 654 F.3d 267, 272 (2d Cir.2011)). A person acts under color of law when he (1) acts in his official capacity "clothed with the authority of state law," or (2) acts "under 'pretense' of law" by purporting to act with official power. *Id.* at \*3–4 (quoting *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)).

**\*6** CB15 and its members cannot be held liable under § 1983 because they did not act under color of law. It is well-established that for all regulatory activities, a "Community Board's role in the review process is merely advisory." *Greenberg v. City of New York,* 38 A.D.3d 245, 832 N.Y.S.2d 16, 21 (1st Dep't 2007) (citing *Cmty. Bd. 7 of Borough of Manhattan v. Schaffer,* 84 N.Y.2d 148, 615 N.Y.S.2d 644, 639 N.E.2d 1, 5 (N.Y.1994)); *Sazon,* 2011 WL 5910171, at \*4 (citing cases). Here, CB15 sent a non-binding recommendation to SLA, which had sole authority over plaintiffs' liquor license application. Since CB15 and its members lacked the power to approve or disapprove plaintiffs' application, and plaintiffs do not allege that CB15 misrepresented its ability to do so, plaintiffs have not adequately pleaded that CB15 or its members acted under color of law. *See Sazon,* 2011 WL 5910171, at \*4. Similarly, Scavo is but a single member of CB15, so her alleged actions and misrepresentations are, a *fortiori,* not under color of state law. Therefore, plaintiffs' § 1983 claim against CB15 and its members is dismissed.

Plaintiffs also fail to adequately plead conspiracy claims under §§ 1985 and 1986. "In order to maintain an action

under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Sylla,* 2005 WL 3336460, at *7 (quoting *Webb v. Goord,* 340 F.3d 105, 110–11 (2d Cir.2003)). A single "thank you" email does not establish an agreement between CB15 and SLA. Similarly, the fact that several named defendants sit on the same community board is insufficient to support the existence of an agreement among them. *Sazon,* 2011 WL 5910171, at *6. "Where plaintiff[s] fail[ ] to state a viable § 1985 claim, [they] cannot state a claim under § 1986." *Sylla,* 2005 WL 3336460, at *7. Accordingly, plaintiffs' §§ 1985 and 1986 claims against CB15 and its members are dismissed.

### ii. Claims against the City of New York

"In order to establish municipal liability for unconstitutional acts by municipal employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy, custom, or practice." *Trigg v. New York City Transit Auth .,* No. 99–CV–4730, 2001 WL 868336, at *11 (E.D.N.Y. July 26, 2001) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A plaintiff can establish this by alleging a formal act of a municipality's governing body, a single act by a municipal employee with policymaking authority, or an informal custom that "is so widespread as to have the force of law." *Sazon,* 2011 WL 5910171, at *5 (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 398, 404 (1997)).

Plaintiffs have not alleged any formal or informal City policies, customs, or practices; CB15 has no policymaking authority, as discussed above; and Scavo's alleged biases and

"actions alone cannot support an inference of the existence of a permanent and well-settled widespread practice." *Andrews v. City of New York,* CV–01–7333, 2004 U.S. Dist. LEXIS 30290, at *33 (E.D.N.Y. Nov. 23, 2004); *Sazon,* 2011 WL 5910171, at *5. Accordingly, plaintiffs' federal claims against the City are dismissed.

 *7  In sum, the Court dismisses all federal claims against city defendants with prejudice.

### III. State and City Law Claims

The Court may decline to exercise supplemental jurisdiction over state and municipal law claims if the Court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *Klein & Co. Futures, Inc. v. Bd. of Trade,* 464 F.3d 255, 262 (2d Cir.2006). Therefore, plaintiffs' state and city law claims are dismissed without prejudice. See *Cave v. East Meadow Union Free Sch. Dist.,* 514 F.3d 240, 250 (2d Cir.2008).

### CONCLUSION

For all of the foregoing reasons, defendants' motions are herebyGRANTED.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 2311837

Footnotes

1    On March 20, 2013, Magistrate Judge Gold granted plaintiffs leave to attach a Proposed Amended Complaint ("PAC") to their supplemental opposition papers. Despite filing the PAC outside the 21 day window to amend as a matter of course, plaintiffs did not seek the Court's permission to amend their Complaint. Fed.R.Civ.P. 15(a). While "leave to amend should be granted 'when justice so requires,' motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 126 (2d Cir.2008) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). To the extent plaintiffs move to amend the Complaint under Rule 15(a), their motion is denied as futile and causing undue delay. The additional five paragraphs of the PAC do not cure the deficiencies of the Complaint, and the PAC has delayed proceedings for weeks by prompting an additional round of briefing.

2013 WL 2311837

2   Plaintiffs claim they committed "minor violations," such as failing to properly display certificates, while SLA found more serious violations, such as noise complaints and "after hours" sales of alcohol. The Court may take judicial notice of the SLA's decision because plaintiffs relied upon it in drafting the Complaint. *David Lerner Assocs., Inc. v. Philadelphia Indem. Ins. Co.,* ——— F.Supp.2d ———, 2013 WL 1277882, at *4 (E.D.N.Y. Mar.29, 2013).

3   According to the minutes, CB15 considered twelve other liquor license applications at the same meeting as Pleasure Island, none of which garnered any opposition. Although the minutes do not indicate whether these establishments are kosher or not, several, such as "Perry's Seafood Restaurant," are very likely unkosher. Magsino Decl., Ex. B.

4   Although the Eleventh Amendment provides sovereign immunity against suits for money damages, it permits suits against state officers in their official capacity that allege ongoing violations of federal law and seek prospective relief. *In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir.2007) (citing *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). While the Complaint makes a lone, passing reference to unspecified injunctive relief, it "fails to sufficiently allege any ongoing violation of federal law, much less any ongoing violation perpetrated by [individual state defendants]." *Foster v. Diop,* No. 11–CV–4731, 2013 WL 1339408, at *9 (E.D.N.Y. Mar. 31, 2013); Compl. at 24. Therefore, despite the volume of ink expended by the parties on this issue, the *Ex parte Young* doctrine is inapposite.

---

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1572801

2014 WL 1572801
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nadine V. TOWNSEND, Plaintiff,

v.

L.T. AUTO TRANSPORT, INC., Defendant.

No. 1:13–cv–1601 (MAD/CFH).
|
Signed April 18, 2014.

**Attorneys and Law Firms**

Nadine V. Townsend, Albany, NY, pro se.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff commenced this action *pro se,* along with ten
other, separate actions, on December 31, 2013. [1] In the instant
action, Plaintiff seeks damages in the amount of $45,000,000
for harm to a van she alleges that Defendant caused while
transporting the van from Texas to New York in 2000. *See*
Dkt. No. 1.

In a January 24, 2014. Report–Recommendation and Order,
Magistrate Judge Christian F. Hummel granted Plaintiff's
application to proceed *in forma pauperis,* denied Plaintiff's
motion to appoint counsel, and reviewed the sufficiency of
the complaint. *See* Dkt. No. 4. Magistrate Judge Hummel
noted that Plaintiff alleged causes of action under several
federal statutes, and determined that "Townsend has failed
to allege a federal statute under which relief is available."
*Id.* at 5. Construing the complaint liberally, Magistrate Judge
Hummel t hen assessed whether the Court could exercise
diversity jurisdiction over this matter if Plaintiff were granted
leave to amend her complaint. Finding that a breach of
contract claim under New York state law would be barred
under the applicable statute of limitations, Magistrate Judge
Hummel determined that any such amendment would be
futile. *See id.* at 6. As such, Magistrate Judge Hummel
recommended that the Court dismiss the complaint with
prejudice for failure to allege subject matter jurisdiction.
*See id.* at 7. Plaintiff has not objected to the Report–
Recommendation.

When a party files specific objections to a magistrate judge's
report-recommendation, the district court makes a *"de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b)(1). However, when a party
files "[g]eneral or conclusory objections or objections which
merely recite the same arguments [that he presented] to the
magistrate judge," the court reviews those recommendations
for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011
WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and
footnote omitted). After the appropriate review, "the court
may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's
report and recommendation, even when that litigant is
proceeding *pro se,* waives any challenge to the report on
appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003)
(holding that, "[a]s a rule, a party's failure to object to
any purported error or omission in a magistrate judge's
report waives further judicial review of the point" (citation
omitted)). A *pro se* litigant must be given notice of this rule;
notice is sufficient if it informs the litigant that the failure
to timely object will result in the waiver of further judicial
review and cites pertinent statutory and civil rules authority.
*See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small
v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d
Cir.1989) (holding that a *pro se* party's failure to object to
a report and recommendation does not waive his right to
appellate review unless the report explicitly states that failure
to object will preclude appellate review and specifically cites
28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of
the Federal Rules of Civil Procedure).

**\*2** Having reviewed Magistrate Judge Hummel's Report–
Recommendation and Order and the applicable law, the Court
finds that Magistrate Judge Hummel correctly recommended
that the Court should dismiss Plaintiffs complaint with
prejudice. A review of Plaintiffs complaint makes clear that
the Court lacks subject matter jurisdiction over this case.
Ordinarily, a court should not dismiss a complaint filed by a
*pro se* litigant without granting leave to amend at least once
"when a liberal reading of the complaint gives any indication
that a valid claim might be stated." *Branum v. Clark,* 927
F.2d 698, 704–05 (2d Cir.1991). An opportunity to amend,
however, is not required where "the problem with [plaintiff's]
causes of action is substantive" such that "better pleading

will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation omitted). As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). Magistrate Judge Hummel correctly recommended that the Court dismiss the complaint with prejudice because the Court lacks jurisdiction over this matter; and, therefore, amendment would be futile.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Hummel's Report–Recommendation and Order is **ADOPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that this action is **DISMISSED with prejudice;** and the Court further

**ORDERS** that the Clerk of the Court shall close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on Plaintiff by regular mail.

### REPORT–RECOMMENDATION and ORDER

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

The Clerk has sent to the Court for review a complaint filed by *pro se* plaintiff Nadine Townsend ("Townsend"). Compl. (Dkt. No. 1). Townsend has also filed a motion to proceed *in forma pauperis* (IFP) (Dkt. No. 2) and requested appointment of counsel (Dkt. No. 3).

### II. DISCUSSION

#### A. *In Forma Pauperis* Application

The Court has reviewed Townsend's IFP application. Dkt. No. 2. Because Townsend sets forth sufficient economic need, the Court finds that Townsend qualifies to proceed IFP.

#### B. Plaintiff's Complaint

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

**\*3** Townsend brings this action against defendant LT Auto Transport alleging that on or about February 15, 2000, Townsend entered into a contract with defendant for the transport of her van from Texas to New York. Compl. ¶ 1. When defendant loaded the van onto its transport truck, the van functioned well. *Id.* ¶ 6. Moreover, Townsend indicated that she did not want the van driven or moved off the transport truck until it reached its final destination. *Id.* ¶¶ 5, 8. The defendant did not ship the van in the time frame indicated, delivering it late to New York. *Id.* ¶¶ 9, 11. When Townsend arrived to pick up the van in New York, the transmission was broken rendering the van inoperable. *Id.* ¶ 9. Townsend believes that the van was driven or otherwise handled improperly, resulting in damages for which the defendant refused to reimburse Townsend. *Id.* ¶¶ 10, 15, 19. Townsend alleges that the van had recently had a new engine installed in it which cost $30,000 and that she was seeking compensatory and punitive damages in the range of $45 million dollars. *Id.* ¶ 20.

The Court is foremost concerned with whether we possess the jurisdiction to entertain this suit and provide the relief sought. It is well settled that a federal court, whether trial or appellate, is obligated to notice on its own motion the basis for its own jurisdiction. *City of Kenosha, Wisconsin v. Bruno,* 412 U.S. 507, 512 (1973); *see also Alliance of Am. Ins. v. Cuomo,* 854 F.2d 591, 605 (2d Cir.1988) (challenge to subject matter jurisdiction cannot be waived); FED. R. CIV. P. 12(h)(3) (court may raise basis of its jurisdiction sua sponte). When subject matter jurisdiction is lacking, dismissal is mandatory. *United States v. Griffin,* 303 U.S. 226, 229 (1938); FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Thus, we begin with a review of the Court's jurisdiction to hear this case. Subject matter jurisdiction may be established in two ways: (1) if there is a federal question pursuant to

28 U.S.C. § 1331; or (2) if there is diversity of citizenship pursuant to 28 U.S.C. § 1332.

Townsend brings this action pursuant to multiple federal statutes, attempting to plead federal question jurisdiction. These statutes include The Federal Magnuson Moss Warranty Act, 15 U.S.C. § 2308(a)(c) ("MMWA"), 18 U.S.C. § 1501, and 18 U.S.C. § 1951. Compl. at 3. [1] None of these statutes appear to be appropriate for the relief sought.

The MMWA "provides a private right of action for a consumer against a manufacturer or retailer who *inter alia* fails to comply with the terms of a written or implied warranty." *Jackson v. Eddy's LI RV Ctr., Inc.,* 845 F.Supp.2d 523, 530 (E.D.N.Y.2012) (citations omitted). These claims, distinguishable from a breach of contract, carry with them a four year statute of limitations. *Id.* at 531. Such actions require "an implied warranty arising under State law in connection with the sale by a supplier of a consumer product." *Id.* at 530 (internal quotation marks, alterations, and citations omitted). Townsend alleges the existence of a service contract. She was not buying a product. There are also no allegations that any written or implied warranties existed. Moreover, the wrong Townsend alleged occurred over thirteen years ago, far beyond the four year statute of limitations. Accordingly, it seems that this is an incorrect vehicle for the present suit.

**\*4** Similarly, 18 U.S.C. § 1501 deals with assault on a process server. This is clearly irrelevant to the chain of events which transpired in the present action.

Last, 19 U.S.C. § 1951 deals with interference with commerce by threats or violence. Specifically:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to so, or commits or threatens physical violence ... in furtherance of a plan or purpose to do anything in violation of this section shall be fined ... or imprisoned ... or both.

*Id.,* § 1951(a). In this case, Townsend does not allege that there was a robbery [2] or any type of extortion [3]. There was no taking of property, as Townsend voluntarily provided the van to defendant for its transport and received her van eventually upon its arrival in New York. Additionally, the defendant never threatened her or acted violently per Townsend's own description of the events. Instead, the events indicate a different cause of action, specifically that the defendant breached its contract with Townsend by delivering her van to New York late and not in the same condition as when it left Townsend's possession in Texas. Accordingly, as Townsend has failed to allege a federal statute under which relief is available, dismissal appears appropriate.

Despite the fact that the statutes that Townsend relied upon do not appear to support her claims, as a *pro se* litigant, her complaint must be read liberally. That, in conjunction with the fact that the civil cover sheet which Townsend completed seems to indicate that she also intended to plead jurisdiction by this Court pursuant to diversity, compels the undersigned to evaluate another basis for her claim. Again, as previously discussed, Townsend's allegations are best categorized as a claim for breach of contract, a state law tort.

For diversity jurisdiction to exist, the matter in controversy must exceed $75,000 and the parties must be citizens of different states. 28 U.S.C. § 1332(a). Townsend seeks damages in the tens of millions of dollars. In order to sustain diversity jurisdiction, there must be complete or total diversity, in that "the citizenship of each plaintiff is diverse from the citizenship of each defendant. *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 68 (1996). As Townsend is a citizen of New York and the defendant is allegedly a citizen of Texas, complete diversity appears to exist. In light of Townsend's *pro se* status, this Court would generally direct Townsend to amend her complaint to provide clearer details regarding diversity jurisdiction.

However, a district court need not grant leave to amend where any such amendment would be futile. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (finding leave to replead would be futile where the complaint, even when read liberally, did not "suggest[ ] that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe"). "Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. American Cyanamid Co.,* 158 F.3d 622, 626 (2d Cir.1998) (citations omitted). In New York, for a breach of contract claim, the statute of limitations for filing suit is six years. *ABB Indus. Sys., Inc. v. Prime Tech., Inc.,* 120 F.3d 351, 360 (2d Cir.1997) (citing N.Y. CIV. Prac. L. § 213(2)). Moreover, "it is well settled that [in New York]

the statute of limitations for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered." *Id.* (citations omitted). Accordingly, as Townsend's cause of action began to run in 2000, almost fourteen years ago, the fact that she just filed her complaint renders it futile as the statute of limitations has expired.

### C. Motion for Appointment of Counsel

**\*5** Townsend has also filed a motion for appointment of counsel. Dkt. No. 3. In light of the present recommendation, this motion is denied without prejudice as moot at this time. However, in the event this recommendation is not adopted and the complaint is accepted by the Court, Townsend is free to renew her request for appointment of counsel.

### III. Conclusion

**WHEREFORE,** it is hereby

**ORDERED** that plaintiff's IFP application (Dkt. No. 2) is **GRANTED;** and it is further

**ORDERED** that plaintiff's request for appointment of counsel (Dkt. No. 3) is **DENIED WITHOUT PREJUDICE** and with a right to renew if this Report and Recommendation is not adopted and the Court accepts Townsend's complaint for filing; and it is further

**RECOMMENDED** that pursuant to the Court's review under 28 U.S.C. § 1915 and § 1915A, Townsend's complaint is **DISMISSED** for failure to properly allege the Court's jurisdiction; and it is further

**RECOMMENDED** that, because of the futility of amendment, Townsend not be provided an opportunity to amend her complaint; and it is further

**ORDERED** that the Clerk serve a copy of this Report–Recommendation and Order on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec ' y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: Jan. 24, 2014.

**All Citations**

Slip Copy, 2014 WL 1572801

---

**Footnotes**

1     *See Townsend v. Dordofsky et al.,* 1:13–cv–1603 (MAD/ATB), Dkt. No. 4 at 3 n. 1 (collecting cases).

1     It appears that Townsend attempted to plead another statute as a basis for relief, but the citation for said statute was indecipherable.

2     Robbery is defined as "the unlawful taking or obtaining of personal property from the person ... against his will, by means of actual or threatened force, or violence, or fear of injury ...." 18 U.S.C. § 1951(b)(1).

3     Extortion is defined as "the obtaining of property from another, with his [or her] consent, induced by wrongful use of actual or threatened force, violence or fear ...." 18 U.S.C. § 1951(b)(2).

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.